INSURANCE CO. v. CRAIG.

(*Nashville.* March 22, 1901.)

1. ACTION. *Against State.*

The express declaration of the Constitution that "suits may be brought against the State in such manner and in such Courts as the Legislature may by law direct," carries with it a positive implication that they shall not be brought otherwise, or at all, unless legislative authority therefor be affirmatively given. (*Post, pp. 628–630.*)

Constitution construed: Art. I., Sec. 17.

2. SAME. *Against Insurance Commissioner is not against State.*

An action brought by an insurance company against the Commissioner of Insurance, to restrain a threatened revocation of its license, is not one that is prosecuted "with a view to reach the State, its treasury, funds, or property," and therefore not within the prohibition of the statute forbidding the Courts to entertain jurisdiction of suits against the State or its officers. (*Post, pp. 628–630.*)

Code construed: § 4507 (S.); § 3507 (M. & V.); §§ 2807, 2807 *a* (T. & S.).

3. INSURANCE. *Object and construction of insurance statutes.*

The chief object of the statutes creating an insurance department, and placing a commissioner at the head of it to administer its affairs, is to protect policy holders, and these statutes should be construed with that object in view. (*Post, p. 645.*)

4. SAME. *Powers of Insurance Commissioner.*

The powers of the Commissioner of Insurance, with reference to granting, refusing, and revoking licenses of insurance companies conferred by our statutes, are discretionary and judicial. His decision of any question that lies within the scope of his authority, as defined by statute, will not be reviewed by the Courts. It is final and conclusive. But his determination that any matter lies within the scope of his statutory authority is

subject to review by the Courts, and, if erroneous, will be vacated or arrested. (*Post, pp. 640–643.*)

Code construed: §§ 3274, *et seq.*, (S.). ·

Act construed: Acts 1895, Ch. 160.

Case cited: State *v.* Thomas, 88 Tenn., 495.

5. SAME. *Same. Case in judgment.*

The Commissioner of Insurance has power, under our statutes, to revoke, and he will not be enjoined by the Courts from revoking the license of a foreign insurance company that undertakes to utterly repudiate, and persists in its utter repudiation of its contract, represented to the commissioner and policy holders as unconstitutional, to reinsure all the risks or policies of another foreign insurance company, numbering several hundred in this State, on the ground that the contract between the two companies was conditioned upon performance of certain things by the reinsured company, in which it had defaulted. The commissioner's authority for such action will be found in those general provisions of the statutes which empower him to revoke the license of any foreign insurance company that "has failed to comply with the law," or that "shall violate or neglect to comply with any provision of law obligatory upon it." (*Post, pp. 643–650.*)

Act construed: Acts 1895, Ch. 160, Secs. 5, 12,

6. SAME. *Same. Meaning of clauses authorizing revocation of license.*

The Commissioner of Insurance is authorized by the above-quoted general provisions to revoke the license of foreign insurance companies, not only for failure or neglect to comply with the requirements of the statute laws, but for failure and neglect to comply with the broader obligations of the common law that go to the general integrity of their business and affect all policy-holders in the same way. (*Post, pp. 643–650.*)

Act construed: Acts 1895, Ch. 160, Secs. 5, 12.

7. INJUNCTION. *Not allowed against public officer, when.*

The rule is so general and obvious as to be almost axiomatic, that a public officer, clothed with discretionary or quasi-judicial power, as contradistinguished from mere ministerial duty, cannot be coerced by mandamus or restrained by injunction in the exercise of his judgment under that power; otherwise the Court would substitute its judgment for his, which is not per-

missible. The Courts will inquire whether such officer has exceeded his power, or has acted under an unconstitutional statute, and restrain him, in a proper case, if he has done so. (*Post, pp. 639, 640.*)

Case cited: Lynn *v.* Polk, 8 Lea, 121.

8. MANDAMUS. *Allowed against public officer, when.*

If the law plainly prescribes a specific act, which is due in point of time, but has been refused on demand, if simply affecting a private right, or only omitted if of public concern, the Court will interpose, at the instance of the proper party, and by mandamus set such officer in motion, leaving him, however, the free exercise of his own judgment and discretion in the manner of performance. (*Post, p. 640.*)

Cases cited: Turnpike Co. *v.* Marshall, 2 Bax., 122; State *v.* Miller, 1 Lea, 606; Morley *v.* Powers, 5 Lea, 698.

9. CORPORATIONS, FOREIGN. *Statutes of.*

A corporation is an artificial person created by law, and possessed of only such powers and rights as its charter confers. It has no inherent migratory power, and can receive none from the sovereignty of its creation that will be effective in other sovereignties. Its recognition in another government is always a matter of pure comity, and never a matter of absolute right. Consequently, a corporation created by one country or State can enter another country or State, and conduct its business there, only by the latter's permission, and only on such terms and conditions as it may see fit to impose. Any State may, in its discretion, entirely exclude corporations of other States and countries from doing business within its borders, or it may admit them under restrictions, and with the exaction of security for the faithful performance of their contracts with citizens. (*Post, pp. 630, 631.*)

Cases cited: Ins. Co. *v.* Ins. Co., 11 Hum , 25; Young *v.* Ins. Co., 85 Tenn., 196; State *v.* Phœnix Ins. Co., 92 Tenn., 420; Dugger *v.* Ins. Co., 95 Tenn., 246; State, *ex rel.*, *v.* Schlitz Brewing Co., 104 Tenn., 752.

10. SAME. *Same.*

After foreign corporations have been admitted the State may revoke their authority to do business, and expel them from its borders whenever it chooses, and upon whatever ground and through whatever agency the Legislature may prescribe. The authority resulting to them from the mere grant of ad-

mission never has the sanction of legal right, but that of comity merely; and from the very nature of the act the government must always be held to have an implied, if not an express, power of revocation. (*Post, p. 631.*)

Case cited: State, *ex rel.*, v. Schlitz Brewing Co., 104 Tenn., 715.

11. SAME. *Same.*

A corporation is a "person" within that clause of the fourteenth amendment to the Federal Constitution, which forbids deprivation of "life, liberty or property without due process of law," but is not a "citizen" within the provision of the same amendment forbidding the abridgment of the "privileges or immunities of citizens of the United States," nor within the meaning of that other clause of the Federal Constitution which declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." (*Post. pp. 631, 632.*)

Case cited: Harbison v. Iron Co., 103 Tenn., 422.

---

FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. H. H. COOK, Ch.

LELLYETT & BARR for Insurance Co.

Attorney-general PICKLE for Craig.

CALDWELL, J. This cause stands on bill and demurrer. The complainant, The North British and Mercantile Company, of Edinburg and London, alleges that it is a corporation chartered and organized under the laws of Great Britain, with authority and power to conduct the business of fire insurance in that dominion and in the vari-

ous States and territories of the United States of America; that it now is, and for years has been, conducting that business in those States and territories under the authority of their respective laws; that it has annually, for several successive years, including the present year 1900, complied with all the laws of Tennessee, and, at great expense, established a business in this State that is now yielding it an income, from premiums, of more than $40,000 per annum; that on April 27, 1900, the complainant entered into the following contract with the Traders' Fire Insurance Company of New York, namely:

"In consideration of $1 (one dollar), the receipt of which is hereby acknowledged, and a further payment of ten thousand dollars ($10,000) before twelve o'clock noon, on Saturday, April 28th, the North British and Mercantile Company, of Edinburg and London, hereby agrees, through its United States manager, to assume the fire risks of The Traders' Fire Insurance Company, of New York, from six o'clock P.M., April 27, 1900, not otherwise reinsured.

"A further payment on account of twenty-five thousand ($25,000) dollars, to be paid on or before May 1, and the balance due, namely, the net unearned premiums on outstanding policies, less 15% commission thereon, to be paid upon com-

22 p—40

pletion of schedules, and at least within thirty (30) days from date hereof.

"This contract to be null and void unless payments as above stated are duly made.

"This temporary agreement to be replaced by a final contract of like terms and conditions, when the total amount due hereunder is determined as per schedules. Schedules to be completed as soon as practicable."

That it thereafter wrote the former representative of The Traders' Fire Insurance Company in Tennessee, as follows:

"UNITED STATES BRANCH,

"NORTH BRITISH & MERCANTILE ISURANCE COMPANY,

"54 William Street,

"NEW YORK, May 9, 1900.

*"Colburn's Insurance Agency, Chattanooga, Tenn.:*

"GENTLEMEN——Referring to Traders' Policy No. 11,258, Julia Gottschalk, expiring May 16, 1902, which with the remaining outstanding business of the Traders' has been reinsured by the North British and Mercantile Insurance Company, we should prefer to cancel this line, which we trust will cause you no inconvenience. If you will kindly send policy to this office, we will see that you are credited with the proper return premium.

"Yours very truly,

"(Signed) EVERETT U. CROSBY,

*"General Agent."*

That, after the expiration of various extensions, The Traders' Fire Insurance Company finally made default in the payment of the consideration for the aforesaid contract of reinsurance, and in consequence thereof the complainant, on August 3, 1900, declared the contract null and void, and gave written notice of the fact to that company and "the various other parties at interest;" that some time after that notification, and notwithstanding the complainant's nonliability "on the said contract to either the Traders' Fire Insurance Company or its policy holders," the defendant sent it a communication in these words and figures, viz.:

"DEPARTMENT OF INSURANCE,

"STATE OF TENNESSEE,

"NASHVILLE, August 21, 1900.

*"North British and Mercantile Insurance Co. of London,*

*No. 54 William Street, New York, N. Y.:*

"GENTLEMEN—I am informed that you deny liability on policies of Traders' Insurance Company held by residents of Tennessee. I hold that the notice of General Agent Crosby addressed to W. J. Colburn & Company, of Traders', under date of May 9, 1900, of which policy holders in Tennessee were notified, waives any provision that may have been contained in reinsurance contract between yourselves and the Traders' Insurance Company. I therefore notify you that unless liability on said Traders' policies in Tennessee is acknowl-

edged within ten days from date, your authority
to transact business herein will be revoked.

"Yours very respectfully,

"(Signed)  E.  B.  CRAIG,

"*Insurance   Commissioner.*"

Before the expiration of the time specified in
that communication this bill was filed to restrain
the Insurance Commissioner, by injunction, from
making the proposed revocation, and to prevent
what complainant alleges will otherwise be an ir-
reparable injury to its good name and business
in this State and elsewhere.

As against the defendant's communication the
complainant charges that he has no authority or
jurisdiction as Insurance Commissioner, or other-
wise, to determine complainant's liability on poli-
cies issued by the Traders' Fire Insurance Com-
pany to Tennessee holders; nor to revoke com-
plainant's license to do business in this State for
the causes mentioned by him.

The grounds of demurrer are (1) that the
complainant's action cannot be maintained, because
it is, in legal effect, a suit against the State;
and (2) that the defendant, as Insurance Com-
missioner, has authority and jurisdiction under the
law to revoke the license of the complainant for
the reasons stated by him, and cannot properly
be restrained by injunction from the exercise thereof
according to his discretion.

The Chancellor overruled the demurrer and granted

the defendant an appeal. The Court of Chancery Appeals affirmed the decree of the Chancellor, and the defendant has appealed again.

The express declaration of the Constitution that "suits may be brought against the State in such manner and in such Courts as the Legislature may by law direct" (Art. I., Sec. 17, last clause), carries with it a positive implication that they shall not be brought otherwise, or at all unless legislative authority therefor be affirmatively given.

The direction of the General Assembly on this subject is found in § 4507 of Shannon's Code, which is as follows:

"No Court in the State of Tennessee shall have any power, jurisdiction, or authority to entertain any suit against the State, or against any officer of the State, acting by authority of the State, with a view to reach the State, its treasury, funds, or property, and all such suits shall be dismissed as to the State, or such of its officers, on motion, plea, or demurrer of the law officers of the State or counsel employed for the State."

This is not a suit against the State *eo nomine;* nor is it a suit against an officer of the State in such sense and for such purpose as to be within the inhibition of the statute. It is a suit against the officer of the State, the defendant being that State's official representative, as Insurance Commissioner, under the Insurance Act of 1895;

but it is not brought "with a view to reach the State, its treasury, funds, or property," and, consequently, is not of the inhibited class.

The second assignment of demurrer takes a broader range, and requires a more elaborate consideration.

A corporation is an artificial person, created by law and possessed of only such powers and rights as its charter confers. It has no inherent migratory power, and can receive none from the sovereignty of its creation that will be effective in other sovereignties. Its recognition in another government is always a matter of pure comity and never a matter of absolute right; consequently a corporation created by one country or State can enter another country or State and conduct its business there only by the latter's permission, and only on such terms and conditions as it may see fit to impose. Any State may, in its discretion, entirely exclude corporations of other States and countries from doing business within its borders, or it may admit them under restrictions, and with the exaction of security for the faithful performance of their contracts with its citizens. *Dartmouth College* v. *Woodard,* 4 Wheaton, 636; *Bank of Augusta* v. *Earle,* 13 Peters, 588; *Paul* v. *Virginia,* 8 Wallace, 168; *Liverpool Insurance Company* v. *Massachusetts,* 10 Wallace, 566; *Hooper* v. *California,* 155 U. S., 648; *Orient Insurance Co.* v. *Daggs,* 172 U. S., 566; *Waters-Pierce Co.* v. *Texas,* 177 U. S., 28;

*Ohio Life Insurance Co.* v. *Merchants Ins. Co.,* 11 Hum., 25; *Young* v. *South Tredegar Iron Co.,* 85 Tenn., 196; *State* v. *Phoenix Ins. Co.,* 92 Tenn., 420; *Dugger* v. *Insurance Co.,* 95 Tenn., 246; *State, ex rel.,* v. *Schlitz Brewing Co.,* 104 Tenn., 752.

And, though once admitted, the State may revoke their authority and expel them whenever it chooses, and upon whatever ground and through whatever agency the Legislature may prescribe. The authority resulting to them from the mere grant of admission never has the sanction of legal right, but that of comity merely; and from the very nature of the act the government must always be held to have an implied if not an express power of revocation.

Notable instances of a State's rightful and approved exercise of this power are found in the anti-trust statutes recently considered and upheld in *Waters-Pierce Co.* v. *Texas,* 177 U. S., 28, and *State, ex rel.,* v. *Schlitz Brewing Co.,* 104 Tenn., 715.

Although a corporation is a "person" within the meaning of that part of Section 1 of the fourteenth amendment to the Constitution of the United States which forbids the deprivation of "life, liberty, or property without due process of law" (*Railway* v. *Ellis,* 165 U. S., 154; *Harbison* v. *Knoxville Iron Co.,* 103 Tenn., 422), it is not a "citizen" within the meaning of that

part of the same section which forbids the abridgment of "the privileges or immunities of citizens of the United States" (*Orient Insurance Co.* v. *Daggs,* 172 U. S., 557), nor within the meaning of the first clause of Section 2 of Article 4 of the Constitution of the United States, which declares that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." *Paul* v. *Virginia,* 8 Wal., 168.

As a condition precedent to admission into this State, foreign corporations are required to have their charters registered in the office of the Secretary of State, and abstracts thereof in the counties in which they desire to transact business. Acts 1877, Ch. 31; Acts 1891, Ch. 122; Shannon's Code, §§ 2545, 2546.

These requirements apply to foreign insurance companies (*State* v. *Phoenix Ins. Co.,* 92 Tenn., 420), and many other exactions are made of them by Chapter 160 of the Acts of 1895, carried into Shannon's Code in § 3274 *et seq.* This Act relates alone to the subject of insurance, and includes in its provisions all nonassessment companies, life and fire, foreign and domestic. The third section makes the Treasurer of the State Insurance Commissioner *ex officio,* and enacts that he, in the latter capacity, "shall exercise the powers and perform the duties conferred and im-

posed on him by this Act, or by any other law of this State."

. The second section defines a nonassessment insurance contract, and declares it "unlawful" for any person to make one "except as authorized under the provisions of this Act."

Section 14 requires every nonassessment company, desiring to do business in this State, to obtain from the Insurance Commissioner a yearly "certificate of authority for every agent;" and Section 4 says: "That before granting certificate of authority to an insurance company to issue policies or make contracts of insurance, the Insurance Commissioner shall be satisfied, by such examination and evidence as he sees fit to make and require, that such company is duly qualified under the laws of the State to transact business herein."

Other sections enumerate various things which all companies are to do as prerequisites to the issuance of certificates of authority, more being required of all foreign companies than of domestic companies (Sec. 9), and more of those chartered in foreign countries (Sec. 10) than of those chartered in other States of the Union.

As to the fact of compliance or noncompliance with these requirements, and all other facts touching the question of qualification to do business in this State, the Insurance Commissioner is, by those parts of Sections 3 and 4 just quoted,

constituted the exclusive judge, and the required certificates of authority can be lawfully issued only when he is "satisfied" of such qualification.

Not only does the Act confer upon the Insurance Commissioner exclusive authority, in the first instance, to grant or refuse the requisite permission to do business in this State, but it also clothes him with power to withdraw that permission after it has been granted, to revoke certificates of authority after issuance.

Some of the grounds of revocation are separately and specifically stated, while others are included collectively in general expressions, as will be seen from the language following:

"Sec. 5. That if the Insurance Commissioner is of opinion, upon examination or other evidence, that a foreign insurance company is in an unsound condition; or, if a life insurance company, that its actual funds, exclusive of its capital, are less than its liabilities; or if a foreign insurance company has failed to comply with the law, or if it, its officers or agents, refuse to submit to examination or to perform any legal obligations in relation thereto, or fail to pay any final judgment against it by a citizen of the State, he shall revoke or suspend all certificates of authority granted to it or its agents, and shall cause notification thereof to be published in one or more newspapers of general circulation, and no new business shall thereafter be done by it or its agents

in this State while such default or disability continues, nor until its authority to do business is restored by the Insurance Commissioner; *Provided, however,* that unless the ground for revocation or suspension relates only to the financial condition or soundness of the company, or to a deficiency in its assets, he shall notify the company not less than ten days before revoking its authority to do business in this State, and he shall specify in the notice the particulars of the supposed violation. If, upon examination, the Insurance Commissioner is of opinion that any domestic insurance company is insolvent, or has exceeded its powers, or has failed to comply with any provision of the law, or that its condition is such as to render its further proceedings hazardous to the public or to its policy holders, he shall apply to a Court of competent jurisdiction, through the Attorney-general for the State, to issue an injunction restraining it, in whole or in part, from further proceeding with its business. . . .

"Sec. 12. That the authority of a foreign insurance company may be revoked if it shall violate or neglect to comply with any provision of law obligatory upon it, and whenever in the opinion of the Insurance Commissioner, its condition is unsound, or its assets above its liabilities, exclusive of capital and inclusive of unearned premiums, as provided in section 8, are less than the

amount of its original capital or required unimpaired funds.

"SEC. 19. That each and every foreign insurance company doing business under the provisions of this Act shall, in January and July of each year, report, under oath of the president and secretary, or other chief officer of such company, to the Insurance Commissioner, the total amount of gross premiums received in this State within the six months next preceding the first of January and July, or since the last return of such premiums were made by such company; and shall, at the same time, pay into the treasury of the State the sum of two dollars and fifty cents ($2.50) upon each one hundred dollars of said gross premiums so ascertained, which shall be in lieu of all other taxes. And any company failing or neglecting to make such returns and payments promptly and correctly shall forfeit to the State, in addition to the amount of said taxes, the sum of five hundred ($500) dollars; and the company so failing or neglecting for sixty (60) days shall thereafter be debarred from transacting any business of insurance in this State, until said taxes and penalties are fully paid, and the Insurance Commissioner shall revoke the certificate of authority granted to the agent or agents of that company to transact business in the State. Domestic insurance companies shall, at the same time, and in the same manner, pay one dollar and

fifty cents ($1.50) on each one hundred ($100) dollars of gross premiums received on policies issued in this State, and be subjected to the penalties provided for foreign companies.

"SEC. 34. That any insurance company that neglects to make and file its annual statement in the form and within the time provided by Section 16, shall forfeit one hundred ($100) dollars for each day neglected, and upon notice by the Insurance Commissioner to that effect, its authority to do new business shall cease while such default continues. . . .

"SEC. 41. . . . Should the fact at any time come to the knowledge of the Insurance Commissioner that any insurance company designated in any license issued by him is not solvent, he shall revoke and cancel the license in so far as it authorizes the broker to contract with that company; and, on notice from the commissioner, it shall be the duty of the broker to whom it was issued to present it forthwith for such cancellation.

"SEC. 48. That should any company having issued an insurance policy or policies under this Act fail to pay any final judgment obtained in this State upon any loss or damage sustained by the insured within thirty days after rendition thereof, it shall be the duty of the Insurance Commissioner to recall and cancel the licenses of all brokers to negotiate and place insurance with such

company on property in this State. All insurance brokers doing business in this State under the provisions of this Act shall have printed in large letters across the face of each policy the following words: 'This company has no deposit and no agents in Tennessee.' Any insurance broker violating this provision shall have license to do business in this State revoked by the Insurance Commissioner."

Speaking generally, the Act continues and enlarges what may properly be denominated a department of insurance for the State, and makes the Insurance Commissioner its legal head or chief executive and administrative officer, with large discretionary or *quasi* judicial functions in reference to both the original grant and the subsequent revocation of business licenses to insurance companies. Granting certificates of authority in the first instance, or revoking them afterwards, necessarily involves the exercise of official judgment and discretion on the part of the Insurance Commissioner. Similar powers conferred by a former Act were characterized as discretionary and judicial in *State* v. *Thomas,* 88 Tenn., 495.

In some instances the revocation should be immediate, while in others it can be made only after due notice. If the Insurance Commissioner "is of opinion" that a foreign insurance company is in an unsatisfactory condition financially, he should revoke its license at once, but if he con-

templates a revocation on any other ground, he must give at least ten days' notice, specifying therein "the particulars of the supposed violation;" or if it be a domestic company that is disqualified, he must resort to some Court of competent jurisdiction for an injunction. Sec. 5.

The alleged disqualification of the complainant not relating to its financial condition, the defendant, as Insurance Commissioner, rightly gave ten days' notice of the proposed revocation, reciting the reasons therefor. Complainant tacitly concedes that the defendant has some power of revocation, but denies that he can revoke for the reasons stated in the notice. Defendant affirms his power to revoke for those reasons, and disputes the right of the complainant to control his action in the matter by injunction.

The rule is so general and obvious as to be almost axiomatic, that a public officer clothed with discretionary or *quasi* judicial power, as contradistinguished from mere ministerial duty, cannot be coerced by mandamus, or restrained by injunction in the exercise of his judgment under that power; otherwise the Court would substitute its judgment for his, which is not permissible. High's Extra. Leg. Rem. (3d ed.), Sec. 42; 2 Story's Eq. Jur. (10th ed.), Sec. 955*a*; *Avery* v. *Job.* (Oregon), 1 Am. & Eng. Dec. in Eq., 73; Appeal of Delaware County, 119 Penn. St., 159;

*Board of Liq.* v. *McComb,* 92 U. S., 541; *Pennoyer* v. *McConnaughy,* 140 U. S., 13.

If the law plainly prescribes a specific act, which is due in point of time, but has been refused on demand, if simply affecting a private right, or only omitted if of public concern, the Court will interpose at the instance of the proper party and by mandamus set such officer in motion, leaving him, however, the free exercise of his own judgment and discretion in the manner of performance (High's Extra. Leg. Rem., Secs. 34, 36, and 41; *Turnpike Co.* v. *Marshall,* 2 Bax., 122; *State* v. *Miller,* 1 Lea, 606; *Morley* v. *Powers,* 5 Lea, 698); or if he assumes to act without lawful authority (as, under an unconstitutional act, *Lynn* v. *Polk,* 8 Lea, 121), a Court of Equity will restrain him by injunction to prevent irreparable injury. Throop on Public Officers, Sec. 842; Gibson's Ch. Pr., Sec. 707; Hilliard on Inj., p. 374; 2 High on Inj., pp. 862, 868; *Greene* v. *Munford,* 5 R. J., 475; 2 Story's Eq. Jur., Sec. 955a; 3 Pom. Eq. Jur., Sec. 1345; 3 Am. & Eng. Dec. in Eq., 556; *Board, etc.,* v. *McComb,* 92 U. S., 541.

However, where the official is authorized by an effective law to do or not to do a given thing upon his own investigation or otherwise, the Courts cannot coerce or restrain his action in reference thereto, but must permit him, in the sphere which

the law has assigned to him, to exercise a free and untrammeled judgment and discretion.

It is even his prerogative, in the first instance, to construe the law under and within which he acts, and the Courts, although of the opinion that his construction is incorrect, will not interfere by mandamus or injunction. *Decator* v. *Paulding,* 14 Pet., 515; *American Casualty Ins. and Sec. Co.* v. *Tyler,* 60 Conn., 448.

The rule of noninterference, on the part of the Courts, with the free exercise of discretionary functions by public officials has been applied in cases too numerous to mention. Some of them are cited in Sections 43 to 46, inclusive, of High's Extra. Leg. Rem. One of those sections is particularly apposite. It is as follows:

"Sec. 44c. Under the legislation of many of the States the duty is intrusted to the State officers of examining the affairs of domestic or foreign insurance companies, and of granting licenses to such companies authorizing them to transact business within the State, if in the judgment of such officers the companies have complied with the requirements of the law, and their condition is such as to entitle them to a license. The general rule denying relief by mandamus to control the action of public officials, when such action involves the exercise of judgment or discretion upon their part, is uniformly applied in this

22 P—41

class of cases. Whenever, therefore, State officers
are invested with discretionary powers, requiring
the exercise of their official judgment, either in
granting, refusing, or revoking licenses to foreign.
or domestic insurance companies, authorizing them
to transact business within the State, their action
will not be controlled by mandamus, and the writ
will not go to compel them either to issue or to·
revoke one already issued. And this is true, even
though the judgment of the Court as to the con-
struction of the statutes under which such license·
has been refused may differ from that of the·
officer, since the Courts will not by mandamus.
substitute their own judgment for that of public·
officers who are charged by law with the perform-·
ance of a duty requiring the exercise of judg-·
ment and discretion on their part."

But, it must always be remembered that the·
public functionary of the class under consideration
can act independently of the Courts only to the·
extent that the law gives him that power. The
law is the source of his authority, and he has
no discretion beyond that conferred. All of his
acts must be within the limits of that authority,.
and of this the Courts must finally judge. Though
he may undoubtedly and in every instance con-
strue the law for himself as to discretionary mat-
ters actually within the law, he cannot by inter-
pretation, however conclusive to his own mind,.
bring within his discretion any matter that is not·

in fact so placed by the law when rightly interpreted by the Courts. His domain is prescribed by the law, and within that domain the discretion given him is beyond the control of the Courts; however, it is the province of the Courts to determine the limits of that domain and keep him within its real bounds and to construe the law and define the limits of his authority in all proper cases.

Then, it is the province of this Court, and not that of the Insurance Commissioner, to determine finally whether or not the action proposed by him, in the present instance, is within the scope of his authority. The Act gives him extensive power of revocation. That power is in a large degree discretionary, and hence beyond extraneous control; but it is not unlimited. It does not include the right to revoke the license of a company when it shall come to the knowledge of the Insurance Commissioner that the president is under or over a certain age, and that the general secretary is of one nationality rather than another, or for any other purely arbitrary reason; nor, indeed, does the defendant, who is an intelligent and useful official, make so extreme a claim as that.

The Act mentions numerous grounds for revocation, some of them being specially stated as "unsound condition" (Secs. 5 and 12), failure to pay final judgment (Secs. 5 and 48), failure

to pay prescribed tax on gross premiums (Sec. 19), etc.; and among others embodied in general phrases are, "has failed to comply with the law" (Sec. 5), or "shall violate or neglect to comply with any provision of law obligatory upon it" (Sec. 12).

. It is by virtue of these two general phrases, and especially the latter of them, which seems to relate more particularly to companies of foreign countries, that the authority for the revocation proposed in the present instance is asserted by the Insurance Commissioner; and if that authority exists at all it must be found there, for it is not given elsewhere. What, then, do those phrases mean, and what matters are included in them? The complainant contends that the words, "the law," as there employed, mean the particular Act in which they occur, and that the other words, "any provision of law obligatory upon it," mean any requirement of this Act without more; and, consequently, that only a failure to meet some one or more of the many requirements of the Act itself affords a legal ground for revocation. If this construction be a correct one, the conclusion suggested follows necessarily; and, besides, it also follows from such a construction that the defendant's proposed action was without authority, for the dereliction set forth in his notice does not concern any duty expressed in any of those requirements.

The defendant insists, however, that those words, "the law," and "any provision of law obligatory upon it," have a more comprehensive signification; that they embrace all law, and every provision of all law that is applicable to foreign insurance companies in this State, the present Act, and other statutes and the common law as well.

This view has in its favor the obvious fact that the Legislature intended, in the interest of policy holders in the State, to confer upon the Insurance Commissioner plenary power to revoke the license of any foreign insurance company that might violate, affirmatively or by noncompliance, any legal obligation affecting their rights. Protection of policy holders and revenue to the State are the controlling objects of the Act, the former being paramount; and one of the chief facilities and safeguards of those purposes, the principal one perhaps, is the power of revocation lodged with the Insurance Commissioner.

It would be unaccountably strange, if in fact true, that the lawmakers did not intend, at least to include among the reasons for which a license might be revoked, a nonobservance of the peremptory requirements of other pertinent statutes. Registration of charter and charter abstracts is the first requirement the law makes of every foreign insurance company desiring to do business in this State, and yet, a discovery by the Insurance Commissioner that a particular company has not

observed that requirement, as it claimed to have done when its license was granted, cannot, under the construction urged by the complainant, be regarded as a ground for revocation, for that requirement is not found in this Act, but only in the Act of 1877 as amended by the Act of 1891. Manifestly that requirement is a part of "the law," a "provision of law obligatory upon" every foreign insurance company coming here to transact business; and a noncompliance therewith was undoubtedly intended to be embraced in this Act of 1895 as a ground for revocation. The same observation may be made in respect of the requirement of Chapter 107 of the Acts of 1893, to the effect that insurance companies shall pay their policy holders "the full amount of loss sustained" up to the maximum sum named in their policies, notwithstanding the presence therein of the accustomed three-fourths loss clause, which that Act was designed to prohibit and nullify.

. The Court deems it but little less certain that the common law obligations of a foreign insurance company that go to the general integrity of its business and affect all policy holders in the same way, are likewise comprehended in the language, "the law" and "any provision of law obligatory upon it;" and, consequently, that breaches of those obligations, persisted in after notice, are among the contemplated grounds of revocation.

The objection that those obligations are so numer-

ous, and some of them so hard to define, that the Insurance Commissioner could scarcely have been expected to understand and rightly apply all of them, is very plausible; but it has not the force that is necessary, under familiar rules of construction, to exclude from the plain words of the statute so important a part of that which they naturally include, and whose inclusion is so entirely in harmony and accord with other parts of the scheme for accomplishing the paramount object of the legislation, viz., protection of policy holders as a class.

It now remains to ascertain the exact ground on which the defendant based his proposed action, and then, as it is clearly not a violation of any statute provision, to inquire whether or not it may properly be characterized as a breach of some common law duty which the complainant owed all of the interested class of policy holders alike.

The Traders' Fire Insurance Company of New York had a large number of outstanding policies on property situated in Tennessee and elsewhere. Desiring to retire from business, that company, on April 27, 1900, entered into a written contract with the complainant, whereby the latter agreed, upon condition that the recited consideration should thereafter be paid, "to assume," from that day, all "fire risks" of the latter "not otherwise reinsured." On May 9, 1900, after the dates for

the payment of two installments of the considera-
tion for $10,000 and $25,000, respectively, had
passed, the complainant wrote a letter to the
former representative of the other company in
this State, advising him that the "outstanding busi-
ness of the Traders' has been reinsured" by the
complainant, and making no reference to the fact
that the contract between the two companies was
conditional. That letter was promptly forwarded
to the Insurance Commissioner, and the Traders'
"policy holders in Tennessee were notified" of
the fact of reinsurance by the complainant. Au-
gust 3, 1900, the complainant declared its con-
tract with the Traders' company "null and void,"
for nonpayment of consideration, and gave notice
thereof to parties concerned.

This latter action of the complainant is the
ground on which the proposed revocation is based.

In view of the fact that the contract, as orig-
inally communicated to the Insurance Commissioner
and Tennessee policy holders in the manner stated,
was one of unconditional reinsurance, he regarded
the subsequent declaration of nullification and in-
validity for noncompliance with an undisclosed con-
dition, as an act of bad faith on the part of
the complainant; and, hence, notified it that un-
less it reversed that course of conduct toward
citizens of this State who hold the Traders' pol-
icies, he would be led to revoke its authority
to continue business here.

It is beyond question that after the contents of its letter of May 9, 1900, became known, the complainant owed the Tennessee patrons of the Traders' company, in the aggregate, the common law duty of good faith in reference to the contract of reinsurance; and, under the ruling already made herein, a violation of that duty would afford proper ground for revoking its license. Whether or not there had in fact been such a violation, however, was a matter to be determined, in the first place, by the Insurance Commissioner according to his official judgment and discretion, the Court having no power to consider it in this proceeding.

The notice of the Insurance Commissioner cannot properly be construed as a demand that the complainant confess ultimate liability on the policies referred to therein, or do any thing else that would cut it off from any legitimate defense it might have to any suit or suits that might be brought thereon.

On the contrary, the most that his language as a whole, and in view of what had previously transpired, can rightly be said to require is, that the complainant must, as to Tennessee policy holders, on pain of disbarment for failure, retract its action in declaring the reinsurance contract null and void, and by such retraction resume its former relation to them, whatever that relation may have been.

It results that the second assignment of demurrer was well made, and should have been sustained, and the bill dismissed, as is now done. . Reversed.

Judges Beard and McAlister dissent from the holding that the violation of a common law obligation is included among the grounds of revocation.