MRS. J. D. QUINTON, COMPLAINANT, APPELLEE, *v.* BOARD
OF CLAIMS, DEFENDANT, APPELLANT.*

AND

MRS. A. Q. HORTON, COMPLAINANT, APPELLEE, *v.* BOARD OF
CLAIMS, DEFENDANT, APPELLANT.

(*Knoxville,* September Term, 1932.)

Opinion filed November 26, 1932.

---

*As to statutory authorization of suits against states, see 25 R. C. L.,
416; R. C. L. Perm. Supp., pp. 5583, 5584; R. C. L. Pocket Part, title
"States," section 52.

Chas. S. Stephens and Geo. E. Jaynes, for Mrs. J. D. Quinton.

O. L. McMahan, for Mrs. A. Q. Horton.

Wm. C. Cook, for Board of Claims.

Mr. Justice Cook delivered the opinion of the Court.

In these causes petitions for *certiorari* were filed under section 9008, Code of 1932, to review an order of

the Board of Claims. The State appealed from the decree of the chancellor sustaining the petitons. Petitioners prayed (1) for writs of certiorari to bring into the chancery court the orders and judgment of the Board of Claims and the record and a transcript of the evidence presented to the Board; (2) that the court review the orders and judgment of the Board of Claims and award petitioners damages, to be paid by the Department of Highways and Public Works, as provided in chapter 75, Acts of 1931. The cases rest upon the same facts and are controlled by the same legal propositions.

August 22, 1932, the automobile driven by Mrs. Horton skidded and turned off the embankment after crossing a bridge one mile east of Sweetwater on Highway No. 2. Mrs. Horton and Mrs. Quinton, the only occupants of the car, suffered injuries. Mrs. Horton's car was damaged. Claims for damages were presented by both occupants of the car to the Board of Claims. Their claim for damages rested upon allegations that the accident was caused by the negligence of State highway employees in failing to station guards or put out caution signals after putting tar or oil on the approaches to the bridge.

Upon evidence presented by depositions and affidavits shown in the certified transcript, and upon the report of the claims agent of the state acting for the Board, the causes were disposed of by the Board of Claims. We quote from the minutes showing the action of the Board:

"Mrs. J. D. Quinton
"vs.                        } Claim for compensation.
"State Highway Department

"This cause came on this day to be heard before the Board of Claims, upon the report of the Law Agent,

recommending the claim be disallowed and upon argument of counsel and on all of the record and proof therein. It appeared to the Board of Claims that the proximate cause of the injury complained of was the result of acts of negligence of Mrs. A. Q. Horton while the claimant was a passenger and guest in the car of Mrs. A. Q. Horton.

"The Board of Claims is of the opinion that there is no liability upon the part of the State Highway Department for the injury therein complained of, that the State Highway Department is not insurer of the transients upon the State Highways; and that the negligence of Mrs. Horton is imputable to her guest, Mrs. Quinton.

"It is, therefore, ordered by the Board of Claims that said claim be dismissed."

"Mrs. A. Q. Horton
"vs.                                                } Claim for compensation.
"State Highway Department

"This claim came on this day to be heard before the Board of Claims upon exceptions to the report of the Law Agent, recommending that the claim be disallowed, and argument of counsel, and all of the proof as in the record contained.

"The Board of Claims is of the opinion that there is no liability upon the Highway Department for the payment of said claim; that acts of contributory negligence upon the part of the claimant were the proximate cause of said accident and injury, the Department of Highways and Public Works not being the insurer of the safety of transients on the public highways of the State.

"It is, therefore, ordered that said claim be dismissed."

It is shown by the record that the Board of Claims considered the claim of both parties upon the report

of the Law Agent employed by the Board, exceptions by both claimants to the Law Agent's report, and the evidence accompanying his report. The exceptions appear at page 13 of the transcript and show that the excepting claimants challenged the weight and sufficiency of the evidence upon which the report of the Law Agent was grounded. The action of the Board of Claims in referring to award damages is challenged and a review is sought by this proceeding under section 9008, Code of 1932, upon statements and allegations in the petitions so similar that the quotation from Mrs. Quinton's petition sufficiently presents their insistence:

"Said Board of Claims created by Chapter 75 of the Public Acts of 1931, met in special session at the call of the Chairman on March 29, 1932, in his office at Nashville, Tennessee, to hear and consider her petition and said Board did hear and consider her petition, upon depositions and other proof introduced by her at said hearing, and that said Board was of opinion that there was no liability upon the part of the State Highway Department for the injuries complained of, and ordered her claim and petition dismissed.

"The proof introduced at the hearing consisted of the depositions of petitioner and many eye witnesses to the accident and to the condition of the road; and also of witnesses who testified that there was no flag or signal to warn travelers of the condition of said road.

"And petitioner will show to your Honor that the evidence introduced by her before the Board of Claims at its special session on March 29th, 1932, fully established all of the averments and facts alleged in this petition.

"She is advised that the order of the Board of Claims is erroneous; that by the provisions of Chapter 75 of the Public Acts of Tennessee, 1931, the Honorable Board was empowered to pay her damges, because the negligence of the Highway Department was such as to entitle her to a judgment in an action at law.

"Petitioner is advised that her only remedy now is to file her petition for *certiorari;* that a complete transcript of the proceedings before the Board of Claims may be certified and forwarded to this Court over which your Honor presides."

She assigns, among others, errors as follows:

"The learned Board of Claims erred in finding and holding that there was no liability upon the part of the State Highway Department for the injury complained of by petitioner because the negligence of Mrs. Horton is imputable to her guest, Mrs. Quinton. The proof does not show that Mrs. Horton was guilty of contributory negligence."

In overruling the exceptions of the petitioners to the report of the Law Agent and by adopting his report, the Board found that the employees of the Highway Department were negligent in failing to station a watchman or put out signals to warn travelers of the fresh-laid tar and oil, and also found that the testimony of Mrs. Horton and Mrs. Quinton established the fact that their own contributory negligence was the proximate cause of the accident which resulted in their injuries.

It appears from the transcript of the evidence on which the Board rejected the claims that Mrs. Horton, an experienced driver, was driving rapidly when she approached the bridge; that she and Mrs. Quinton saw the tarred surface and saw also an approaching car

skid as it came off the bridge. While Mrs. Horton slowed down, she states that she ran on after slowing down at a rate of at least 20 miles an hour—Mrs. Quinton thinks 15 miles an hour. In this connection we quote Mrs. Horton's testimony:

"Mrs. Horton you approached the bridge from the east?

"Yes.

"How is the road there, level or uphill?

"It's up hill; a slight grade.

"No curve at the east side?

"Yes there is a slight curve at east side.

"You can see through the bridge from either side?

"Yes you can.

"This tar that you speak of, how close were you to it when you first observed it?

"About 10 feet I would say.

"At what rate of speed were you travelling then?

"I couldn't say how fast but I slowed up considerably when I saw it was wet.

"Give us your best judgment.

"35 or 40 miles I guess. I was not going over 20 or 25 miles when I was on the tar.

"And you observed it about ten feet, before you got to it?

"Yes.

"When did you slacken your speed?

"As much as I could before I got on it and as much as I could after I got on it.

"You slackened your speed about ten feet before you hit the tar?

"This car coming was skidding toward me and I could see the danger just as soon as I got on it.

"How far ahead did you see this car coming?

"Five or six feet.

"You never observed it coming through the bridge?

"It was nearly over the bridge.

"As you went on the bridge, you passed the car coming off of it?

"Yes sir.

"Did you slow down to pass the car?

"I slowed down for all of it.

"Is it your usual custom to slow down to pass a car?

"Yes I generally do.

"Did you slow down on account of the car?

"Yes.

"And then you ran 10 feet. For what distance along the road was this tar at the east end of the bridge?

"I couldn't say. There was more tar on the east end than the west.

"Give us your best judgment as to how much was on the east end?

"Just as I got over the bridge?

"What was the length of the tar spread along the road on the east side of the bridge?

"Just a small amount on the east side.

"How many feet? About how far?

"I would say three or four feet; just a small amount before we got on to the bridge.

"Then it had only been spread three or four feet on the east side?

"I really can't say. It seems there was as much as there would be to that door there before we got on to it; from here to that door there.

"Do you mean this door here?

"Yes.

"How many feet is that Mrs. Horton?

"Well, 15 or 20 feet; there may have been more.

"Well it was the same kind of tar that was at the other end of the bridge?

"Yes.

. . . . . . .

"What was the length of the bridge from one end to the other?

"I would say it was from this wall almost to where the end of this desk is in here. I would say that it was that long.

"Would that be 40 feet?

"I guess so.

"You passed a car coming toward you just as you went on the bridge, and it was coming off of the bridge?

"Yes.

"There was nothing the matter with your car at that time was there?

"No sir.

"And you were running about how fast?

"Not over 20 miles.

"And as you crossed over the bridge, how fast were you running then?

"I was not going any faster if as fast, because I slowed up considerably; didn't feed it any gas; about 15 or 20 miles I would say.

"Where were you when you observed the tar on the other side?

"I was on the bridge.

"How far through the bridge?

"I was not very far through, because that's where I had an accident, just as we went over the bridge.

"When you entered the bridge, couldn't you see the tar on the other side of the bridge?

"Yes I saw the tar.

"And you didn't slacken your speed there?

"Yes I slackened as much as I could. I slackened my speed all the way across the bridge.

"Did you put your brakes on?

"No because my car skidded a little bit. It was running through the bridge alright. Was not uneasy; never thought of having any trouble; I realized it was wet and I have always been told of the danger of slowing up on a wet road.

"This road was not wet?

"Yes it was wet and slick.

"Why didn't you stop your car?

"I didn't think there was any danger until I saw this car coming skidding, and of course, I slowed up.

"Where were you when you first saw that car coming?

"I was on the bridge and he was nearly off of the bridge.

"You never saw him coming through that bridge?

"I was on the bridge when I saw him.

"When you first observed that car, were you entering the bridge or what were you doing?

"I was entering the bridge.

"Then he had to run across that bridge before he passed you?

"Yes.

"You had slowed your speed down from 20 to 25 feet before you got to the bridge. That is the distance that you saw the car ahead of you and the distance of the tar?

"I saw the car as I got on the bridge.

"You slowed your car down 20 feet east of the bridge because you saw this car?

"No.

"Why?

"Because I saw it was wet. I didn't know what it was. I knew it was something on there.

"You run through the bridge without putting your brakes on or stopping your car or lowering your speed?

"I was going about 20 miles. I had no occasion to put them on.

"You saw the tar before you got on it?

"I had travelled through tar several times and never had any trouble.

"You were excited?

"No I was not a bit excited; never thought of being excited.

"You never said anything to Mrs. Quinton?

"No sir.

"Didn't you tell her about 10 feet east of where the tar begin, didn't you ask her 'What is that?'

"I says: 'What is that?' It was cloudy and I thought it had rained. I said: 'What is that,' and she said 'I don't know.' Never thought a thing about it being tar.

"You never did know what it was?

"I didn't know whether it was oil or tar.

"If you didn't know, why didn't you stop?

"I would have if there had been some kind of a danger signal to have cautioned me to stop."

In the same connection we quote from Mrs. Quinton's deposition:

"Then as you entered on the bridge, another car was coming off of the bridge?

"I don't think we were both on the bridge at the same time.

"You didn't slow up for that car?

"She slowed up when she saw that the best she could.

We were nearly in it when we saw it.

"Didn't she slow up to pass that car?

"She was on her side of the road and was not going fast and didn't need to slow up much.

"What speed do you think she was going after she slowed up?

"About fifteen miles.

"You passed that car at about fifteen miles speed?

"Yes that would be my estimate.

"And passed it going east coming off of the bridge, and you going west entering on the bridge. Is that right?

"Yes sir.

"So you ran through the entire length of the bridge and beyond, as you have stated, before you went off?

"Yes sir.

"And you were not running over 15 miles an hour when you passed the car?

"That would be my estimate.

"How much tar was on the west side of the bridge?

"I should think about the same.

. . . . . . .

"When you got on the bridge, you could see the tar on the west side?

"Yes sir.

"Did you see it?

"Yes.

"Did you say anything to her about it?

"No sir, I don't remember it if I did.

. . . . . . .

"You said this car commenced to skid. How long after you passed the car until it commenced to skid?

"Just as we were passing it.

"It didn't have much skidding room right there, did it?

"No sir.

"Did your car stop skidding after you passed this car?

"It kept skidding until it skidded off.

"But didn't hit any hand-rail?

"I don't think so.

"It was not skidding as you passed the car, was it?

"Just as we passed, if I am not mistaken, it was.

. . . . . .

"And when it was skidding while you were passing the car, it didn't hit the railing at that time?

"No sir.

"At the time you first observed the tar, had you at that time observed the approach of the car?

"I don't remember. I should think I could, because we could see the road . . .

. . . . . . .

"Do you remember whether or not Mrs. Horton had slowed her speed at the time you first saw the car?

"She lowered her speed just about the time I noticed it.

"And you think she cut it from 20 to 15 miles an hour?

"Yes that would be my estimate.

"Did she lower it any more before you went off, that you observed?

"I don't think so.

. . . . . .

"Do you know whether you said something first to Mrs. Horton as you got on to the tar, or what was said by either of you?

"I think she said, 'What is that?' I would not want to give exact words but I think she made a remark about it.

"At the time she said that, how long until you were into the tar?

"A short time.

. . . . . . .

"Did you say anything or tell Mrs. Horton to do anything that she could have done to have extricated you and her from that peril?

"I did not speak to her. I don't think I spoke.

"Was that from fear of the condition you were in or because you thought it not best to disturb the driver?

"I have always thought it best not to excite the driver, and I thought she had been driving a car longer than I had and knew more about it than I did. In fact I have never driven anything except a Ford."

This evidence was considered by the Board of Claims and upon it rests their conclusion that the negligence of the claimants was the proximate cause of the accident; and for that reason they should not have an award of damages.

Underlying the statements, allegations and prayer of each petition is the assumption that section 9008 of the Code of 1932 authorizes a transfer of the proceedings from the Board of Claims to the chancery court for review *de novo,* reversal of the action of the Board of Claims, and judgment as if in an original action against the State. However, at the bar counsel for one of the claimants said that might be too broad an application of section 9008 and, if so, the proceedings should be remanded to the Board of Claims for correction of error in disallowing the claims presented.

█ No rule of statutory construction could justify that assumption of judicial power. The State cannot be subjected to litigation at the suit of individuals unless

the words of the Act are so plain, clear and unmistakable as to leave no doubt of the intention of the legislature that it should be done. *Western Union Tel. Co.* v. *Western & A. R. Co.*, 142 Ga. 532. This doctrine rests upon public policy, designed to free the State from the embarrassment and the burdens that would result. It is so because obviously subjection of the State to litigation with travelers on State made and maintained highways, requiring it to go into the courts, and defend actions brought by every citizen with a real or alleged grievance would immeasurably impair respect for sovereignty, and make inroads upon a dwindling public revenue, gathered, to the extent of almost confiscation, by tax laws that now spread heavily upon once wealthy citizens and once wealthy communities, and also include the poorest hamlet and the humblest citizen.

For the claimants it is insisted that when the State recognized liability for injury resulting from negligence in the construction and maintenance of highways it must follow that any claimants dissatisfied with the result before the Board of Claims may arraign the State before a court for reversal of the decision through the procedure indicated by section 9008 of the Code of 1932.

General procedural statutes in which the State is not specifically named, and which, if applied, would operate to restrict the State's sovereignty, cannot be invoked against the State.

The last clause of Article I, section 17 of the Constitution provides that suits may be brought against the State in such manner and in such courts as the legislature may by law direct. This provision carries the positive implication that suits shall not be brought otherwise, or at all, unless the authority be affirmatively given by statute. *Insurance Co.* v. *Craig*, 106 Tenn., 629.

216

The legislature from time to time exercised the power conferred by Article I, section 17 of the Constitution or similar provisions in preceding Constitutions. But later, under the caption "An Act to protect the State from suits and judgments" the General Assembly of 1873, chapter 13, enacted "that no court in the State of Tennessee has, nor shall hereafter have any power, jurisdiction or authority to entertain any suit against the State, or against any officers of the State acting by authority of the State, with a view to reach the State, its treasury, funds or property, and all such suits now pending or hereafter brought, should be dismissed as to the State or such officers, on motion, plea, or demurrer of the law officers of the State or counsel employed by the State." This statute is embodied in section 8634 of the Code of 1932, effective January 1, 1932.

By chapter 75 of the Acts of 1931, passed July 2, 1931, the legislature created a Board of Claims with a limited power. It was only vested with power and authority to investigate, hear proof, if necessary, and compensate for damages sustained to either person or property, as a result of negligence in the maintenance and construction of State highways, or in the operation of the machinery or equipment of the Highway Department of the State, while engaged in the construction or maintenance of State highways; or to person or property as a result of the negligence of the officials or employees of the Highway Department while engaged in the actual construction or maintenance of State highways. Provided, however, that such settlement award shall only be made after a careful and thorough examination and consideration of all the facts surrounding the matters in controversy. No award shall be made unless, in the

opinion of the Attorney General, the facts found by said Board or court establish such a case of negligence on the part of its Highway Department or its agents as would entitle the claimant to a judgment in an action at law, if the State were amenable to suit. Provided, further, that said award and settlement must be approved by the Governor before the same becomes payable.

This statute does not open up the broad field of litigation against the State. It confers no power to sue the State in an action of damages for injuries on a highway but merely confers power on the Board to award compensation provided. (1) The Board in the exercise of their discretion shall conclude, after examination and consideration of the facts, that the claimant is entitled to the award. (2) In the opinion of the Attorney General the facts establish such a case of negligence as would entitle the claimant to a judgment if the State could be sued. (3) Provided the Governor shall approve the settlement.

By thus safeguarding the State from suit, the legislature evinced a purpose to confine the inquiry and determination to the Board of Claims, the Attorney General and the Governor; and by implication excluded any other remedy. Especially so since by section 8634 of the Code all jurisdiction to entertain suits against the State is expressly taken away from the courts. *Walters* v. *State,* 2 Chan. Cas., 69. And the right to sue the State cannot exist without affirmative authority from the legislature. *Insurance Co.* v. *Craig,* 106 Tenn., 621; *State* v. *Odom,* 93 Tenn., 446; *State* v. *Sneed,* 9 Baxt., 472; *Williams* v. *Register,* Cooke, 214.

Supposing a proposition that cannot be conceded, that section 9008 of the Code of 1932 opens for review *de*

*novo* in the courts all proceedings before statutory boards and commissions, it could not be assumed that the legislature intended, by enacting that provision, to compel the State to go into the courts after a final determination by the Board of Claims and defend as if an original action had been brought against it. The courts cannot assume by indirection a power that is expressly denied. What is directly prohibited by section 8634 of the Code of 1932 could not be avoided through the indirect method of assuming the power of review alleged to have been given by section 9008.

The courts cannot, in the absence of express statutory authority, sit in judgment on errors of fact, if any committed by the Board. Its conclusion was final. There can be no review for alleged error in the exercise of judgment in weighing and finding facts and reaching a conclusion thereon.

The decrees of the chancellor are reversed and the petitions are dismissed.