VIRGINIA SURETY COMPANY, Inc.,

v.

KNOXVILLE TRANSIT LINES, Inc.

VIRGINIA SURETY COMPANY, Inc.

v.

TENNESSEE COACH COMPANY, Inc.

Civ. A. Nos. 1076 and 2074.

United States District Court
E. D. Tennessee, N. Division.

Nov. 8, 1955.

R. R. Kramer, Charles E. McNabb, Kramer, McNabb & Greenwood, Knoxville, Tenn., for plaintiff.

Anderson & Snepp, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

Virginia Surety Company, Inc., seeks a recovery against the Knoxville Transit Lines, Inc., and the Tennessee Coach Company, Inc., for a sum in excess of $107,000 plus interest which it claims is due for automobile public liability insurance premiums owed by the defendants for insurance covering the periods from July 1, 1946 to, and including, September 8, 1947.

The defendants were engaged in the business of public carriers of passengers by bus during the time that the premiums accrued and are engaged in that business at the present time.

The Knoxville Transit Lines., Inc., which will be referred to as KTL operates a bus company for transportation of passengers within the City of Knoxville and surrounding suburbs.

The Tennessee Coach Company, Inc., which will be referred to as TCC, is engaged in the business of transportation of baggage, passengers and express in an inter-city service.

The entire capital stock of KTL was owned by Tennessee Coach Company during the period that is involved in the controversy and Al Kraemer was the president and general manager of each company.

Virginia Surety Company, Inc., issued to each defendant a policy of automobile public liability insurance effective July 1, 1946 with limits of $25,000/$200,000/-$5,000, covering an operation of a fleet of passenger motor vehicles owned by each insured. Virginia Surety Company, Inc., claims that for the 12-month period, July 1, 1946 to June 30, 1947, each insured agreed to pay premiums to be computed in accordance with the provisions set forth in identically phrased premium endorsements dated July 1, 1946 and attached to each of the policies; that for the period from July 1, 1947 to September 8, 1947, each insured agreed that the amount of its premium was to be computed in accordance with the provisions set forth in identically phrased endorsements dated July 1, 1947, which were attached to each policy. These endorsements superseded and replaced the endorsements dated July 1, 1946. On September 8, 1947, Virginia Surety cancelled each policy. The complaints were amended, or supplemented, several times.

Plaintiff claims that for the first six months of coverage, namely, July 1, 1946 to December 31, 1946, KTL owed premiums in the amount of $24,153.67 and TCC in the amount of $9,514.38; that for the second six months, January 1, 1947 to June 30, 1947, KTL owed $15,043.86 and TCC owed $37,095.42; that during the last period covered by the policies, namely, July 1, 1947 to September 8, 1947, KTL owed for adjusted premiums the sum of $10,678.27 after receiving credit for its deposit of premiums of $5,000.

The entire amount claimed to be due from KTL during the entire 14-month period between July 1, 1946 and September 8, 1947, is $44,875.80, plus interest.

Virginia Surety Company, Inc., claims that TCC owes for adjusted premiums that accrued during the last two-month period from July 1, 1947 to September 8, 1947, the sum of $22,087.20, on which it is entitled to a credit of $6,000 for its deposit of premiums in that sum, which leaves an amount due and owing by TCC for the entire 14-month period, between July 1, 1946 and September 8, 1947, of $62,697.

Virginia Surety Company calculated the premiums by computing the bodily injury losses under the primary limits of $5,000/$10,000 upon a 100/60 loss ratio basis, also the property losses on the same basis. This means that for every loss of $60 the insured paid the insurer $100. In addition to the $100 paid, the insurer added 92% of the premium, making a total of 192% paid on the standard limits of $5,000/$10,000 for personal injuries. The 92% was added to the premiums for payment on the excess

coverage under the policy, namely, $20,-000 for injuries to one person and $190,-000 for injuries growing out of one accident. The same formula was used in computing the property losses.

KTL claims that the endorsement on its policy does not provide for a separate bodily injury premium for limit of $20,-000/$190,000 in excess of $5,000/$10,-000, that is, one premium for standard coverage and another for excess coverage, as claimed by the insurer.

KTL claims that the premium for the first six-month period as provided by the endorsement and understood by the parties prior to the issuance of the policy was $56,132.65, or 100/60 of the total bodily injuries and property damage losses for that period on which amount it paid the provisional rate of 2¢ per mile, or $48,307.34, leaving a premium balance due for that period of $7,825.31 which amount, together with the court costs, it tendered into Court.

TCC says that it paid $104,696.64 provisional premium of 2¢ per lineal mile for the first six-month period and without admitting the accuracy of plaintiff's claim that the losses incurred during this period amounted to $39,778.70; that such figure is the accurate amount of premiums which they agreed to pay during that period which was $66,297.83, or 100/60 of the total (bodily injuries and property damages) losses for that period, thereby resulting in an overpayment to plaintiff in the amount of $38,-398.81 for that period.

Defendant claims that for the second six-month period, January 1, 1947 to June 30, 1947, KTL paid $48,317.36, representing the 2¢ per lineal mile provisional premium, and TCC at the same provisional premium rate per lineal mile paid the sum of $97,732.02, and that without admitting the accuracy of the figures of plaintiff, representing the losses and expense for that period, $23,822.13 being the KTL losses as claimed by plaintiff, and $49,275.14 claimed losses of TCC, but assuming the accuracy of such figures, the premium calculated in accordance with the meaning of the July 1, 1946

endorsements amounted to $39,703.55 in the case of KTL and $82,125.23 in the case of TCC (100/60 of the total paid and total losses for that period), and that KTL is entitled to a refund of $8,613.81 and TCC the sum of $15,506.79.

KTL and TCC admit that the basis for the computation of the premium for the third and last period (two months and eight days), July 1, 1947 to September 8, 1947, as contended for by the plaintiff, is correct.

KTL does not admit that for such period losses have been paid by the insurer which would make the premiums due for that period $10,678.27.

TCC denied that plaintiff is entitled to recover the amount of premiums claimed for this period.

As further defenses to the suits, KTL and TCC contend that plaintiff failed to comply with Chapter 142 of the 1945 Public Acts of Tennessee in that it had not filed the premium rating plan with the Tennessee Commissioner of Insurance and Banking at the time the policies were issued and had not had the endorsements on said policies approved as required by subsection (h) of Sec. 3 of the Act; that plaintiff's construction of the endorsements is contrary to Sec. 2 of the Act in that such construction requires the payment of unfair and excessive rates that are prohibited by the Act, and that the policies are illegal, void, unenforceable and against public policy.

KTL and TCC by counter-claim seek recovery from the defendant the entire amount of premiums paid by them. KTL claiming $101,624.70 and TCC $208,228.-66, representing the provisional premiums and premium deposits paid by them plus interest and costs. This claim is based on defendant's violation of Chapter 142 of the 1945 Public Acts of Tennessee, above mentioned.

In the alternative, TCC seeks recovery of $54,055.60, for claimed premium overpayment for the first two six-month policy periods, July 1, 1946 to June 30, 1947, plus interest. That the endorsements provide for the calculation of the premi-

ums by applying one rate for standard limits and another for excess limits, is denied in the cross-action. Cross-claimants say that if they are mistaken in their interpretation of the endorsements that such endorsements should be reformed so as to set forth the true intentions of the parties to provide for one premium for the limits in the policies without differentiating between standard limits and excess limits and that this premium be computed on a 100/60 loss ratio basis. Cross-claimants ask that the July, 1946 premium endorsement be reformed so as to strike therefrom all language upon which plaintiff claimed the right to compute the premiums by applying separate and distinct rates for standard limits and excess limits for coverage.

KTL claims that at the time it tendered $7,825.31 into Court as additional premium for the period July 1, 1946 to December 31, 1946, it relied upon the accuracy of plaintiff's figures shown in Exhibit B of the complaint; that thereafter plaintiff furnished a list of claims which shows a reserve overcharge of $100 on claim No. 19626, which overcharge resulted in an additional premium of $166.67 during the first six-month period to which it is entitled to credit.

Virginia Surety Company denies that defendants are entitled to any relief under their cross-claims. It says that defendants accepted benefits under the policies for more than eleven months without registering any objection, leading counter-defendant to believe that the agreements as set forth in the endorsements constituted the contracts between the parties; that counter-defendant exposed itself to the maximum limit under the coverage of the policies during this period of time but had it known of the contention they are now making in the cross-claim, cross-defendant would have cancelled the policies; that approximately five months after delivery of the two policies cross-plaintiffs again had the written terms of the premium endorsements called to their attention but failed to register any objection thereto; that such notice was issued to TCC similar to those involved in the present controversy, which policy had attached to it a premium endorsement containing identical provisions with those in the present suits; that such cancelled policy and its premium endorsement issued to TCC was negotiated simultaneously with the negotiation and issuance of the policies and premium endorsements which KTL and TCC seek to have reformed; that the principal negotiator with reference to each of these policies was Al Kraemer, their president; that about December 16, 1946, president Kraemer accepted from Virginia Surety Company on behalf of TCC refund of over $3,000 on said policy; that this refund was computed in accordance with the identical provisions which TCC and KTL seek to have reformed in this suit on the ground of Virginia Surety's alleged mistake, inadvertence or probable fraud; that under these circumstances KTL and TCC are estopped from seeking reformation of the July 1, 1947 premium endorsements.

The first question for determination is whether the failure of Virginia Surety Company to have the premium endorsements approved by the Tennessee Commissioner of Banking and Insurance, as required by Chapter 142 of the 1945 Public Acts of Tennessee, Sec. 3, subsec. (h), renders the endorsements invalid and unenforceable and if the endorsements are invalid because of such failure, whether KTL and TCC are entitled to recover all money paid under the insurance policies.

It is stipulated that Virginia Surety failed to have the endorsements approved by the Commissioner of Insurance and failed to file the rates provided for in the endorsements with the Commissioner of Insurance for approval.

The pertinent parts of Chapter 142 of the 1945 Public Acts of Tennessee, Williams' Tennessee Code, Section 6356.-20 et seq., provide as follows:

"This Act applies to casualty insurance, * * * on risks or operations in the State, * * *. This Act applies to any casualty insur-

ance company, * * * engaging in or proposing or attempting to engage in any kind of casualty insurance * * *."

Section 2 provides:

"All rates shall be made in accordance with the following provisions:

* * * * * *

"4. Rates shall be fair, reasonable, adequate and not unfairly discriminatory."

Section 3(a) provides:

"(a) Every insurer shall file with the Commissioner every manual of classifications, rules and rates, every rating plan and every modification of any of the foregoing which it proposes to use. * * *"

Section 3(h) provides:

"(h) Beginning ninety days after the effective date of this Act no insurer shall make or issue a contract or policy except in accordance with the filings which have been approved for said insurer as provided in this Act."

Section 10 sets forth the penalties prescribed for violation of the Act. This section reads:

"Sec. 10. *Be it further enacted,* That any person, partnership, association, corporation, insurer or rating organization which shall violate the provisions of this Act shall be liable for a penalty in the sum of Five Hundred ($500.00) Dollars for each such violation, to be recovered for the use of the State of Tennessee in a civil action to be brought in the name of the State by the Commissioner in a court of competent jurisdiction.

"In less aggravated cases the Commissioner, within his discretion, is authorized to abate such part of the foregoing penalty as the facts of the particular case warrant and to bring suit for such lesser amount as may be determined, or to accept such lesser amount in settlement of the State's claim for penalties. Any abatement or settlement of the penalties herein provided by the Commissioner shall be with the consent and approval of the Attorney-General.

"The Commissioner may suspend the license of any rating organization or insurer which fails to comply with an order of the Commissioner within the time limited by such order, or any extension thereof which the Commissioner may grant. The Commissioner shall not suspend the license of any rating organization or insurer for failure to comply with an order until the time prescribed for an appeal therefrom has expired or, if an appeal has been taken, until such order has been affirmed. The Commissioner may determine when a suspension of license shall become effective and it shall remain in effect for the period fixed by him, unless he modifies or rescinds such suspension, or until the order upon which suspension is based is modified, rescinded or reversed.

"No license shall be suspended except upon a written order of the Commissioner, stating his findings, made after a hearing held upon not less than ten days' written notice to such person or organization specifying the alleged violation."

■ The foregoing Act has not been construed by the Tennessee Appellate Courts. In view of this situation, this Court must use such materials as are available in an effort to decide what the Supreme Court of Tennessee will do if, and when, a similar question is presented. Griswold v. Dixie Foundry Co., Inc., D.C.E.D.Tenn.1948, 79 F.Supp. 79, 80, and Sterling Drug, Inc., v. Anderson, D.C.E.D.Tenn.1954, 127 F.Supp. 511, 513.

■ The opinion of the late Judge Williams, speaking for the Supreme Court of Tennessee, in the case of Biggs v. Reliance Life Insurance Co., 137 Tenn. 598, 604, 195 S.W. 174, 176, states the general rule as follows:

"The general rule, broadly stated, is that a contract explicitly prohibited by statute is void, and that a prohibition may be implied from the fact that a penalty is prescribed. But the rule is not an inflexible one, and mere imposition of a penalty does not of necessity, or in all circumstances, mean that a contract in contravention of the statute is so far void as to be unenforceable by any one a party to it. The courts, the statute not in terms denouncing the contract as void, may look to the indicia above referred to and gather a more limited legislative purpose, especially where it is not necessary to declare the contract absolutely void in order to accomplish the legislative design."

The conclusion of the Court, 137 Tenn. at page 607, 195 S.W. at page 176 is stated thus:

"We are of opinion that the policy contract was not rendered void as to the insured. Contracts should be struck down only when it is necessary to vindicate a sound policy of the law, and only to the extent that may be required. Where only a subsidiary or collateral agreement is violative of a statutory inhibition, and it is capable of segregation for denunciation, the policy itself should not be declared void; that the statute not having so provided in explicit terms. We do not believe that the Legislature intended that the policy should be unforceable when issued in the circumstances of this case."

The provisions of Section 10 of the 1945 Act give the Commissioner of Insurance broad discretion in fixing the penalties thereunder. There is no language in the Act indicating that the Legislature intended that an insurance policy providing for premium rates unapproved by the Commissioner is invalid or unenforceable. The broad discretion given the Commissioner of Insurance in the Insurance Act indicates an intent to regulate the insurance business and not to prohibit it.

In the recent case of McCullough Transfer Co. v. Virginia Surety Co., Inc., 6 Cir., 1954, 213 F.2d 440, the Court of Appeals of this Circuit had before it a retrospective premium endorsement issued by the same insurance company which is the plaintiff in these cases. The endorsement in that case was apparently similar to the endorsements involved in the present cases. The endorsement in that case was issued in the State of Ohio by plaintiff, Virginia Surety Company to McCullough Transfer Company but in violation of an Ohio statute which by comparison is almost identical with the Tennessee statute.

Sections 9592–21(a) and (h) of the Ohio General Code are as follows:

"(a) Every insurer shall file with the superintendent every manual of classifications, rules and rates, every rating plan and every modification of any of the foregoing which it proposes to use.

\* \* \* \* \* \*

"(h) On and after January 1, 1948, no insurer shall make or issue a contract or policy except in accordance with the filings which are in effect for said insurer as provided in this act \* \* \*."

Section 9592–33:

"Any person or organization, who wilfully violates any provision of this act, shall be deemed guilty of a misdemeanor and shall upon conviction thereof, be punished by a fine not to exceed $500.00 for each such violation. The superintendent may suspend the license of any rating organization or insurer which fails to comply with an order of the superintendent within the time limited by such order, or any extension thereof which the superintendent may grant.

\* \* \* \* \* \*

"No penalty shall be imposed and no license shall be suspended or re-

voked except upon a written order of the superintendent, stating his findings, made after a hearing held upon not less than ten days' written notice to such person or organization specifying the alleged violation."

Section 9592–35:

"This act shall be liberally interpreted to the end that insurance rates shall not be excessive, inadequate or unfairly discriminatory, and cooperative action among insurers in rate making and in other matters within the scope of this act shall be authorized and regulated. * * * "

McCullough, the insured, insisted that because the endorsement had not been filed or approved as required by the Act, the endorsement was illegal and the insurance company was therefore precluded from recovering the premium due thereunder.

The Court, speaking through Judge Miller, held adversely to the contention of McCullough in the following language [213 F.2d 442]:

"It is agreed between the parties that the business of insurance is affected with a public interest and subject to regulation by the State. But we do not agree with appellant's contention that it necessarily follows that a failure to comply with the provisions of a regulatory statute relating to insurance renders null and void a policy of insurance freely entered into by the parties. In order to determine whether a contract made contrary to a penal statute is illegal and void, the statute must be considered as a whole to ascertain whether it was the intention of the Legislature that the statute have such effect. Warren People's Market Co. v. Corbett & Sons, 114 Ohio St. 126, 132, 151 N.E. 51.

"There is no express provision in the foregoing sections of the Ohio General Code which states that a failure to comply with any of the provisions contained therein renders

an insurance contract void. If such was the intent of the Legislature it could easily have said so in express words. On the contrary, the statute provides a $500.00 fine for a willful violation of the Act and that the license of any insurer who fails to comply with an order of the superintendent may be suspended. The provisions of Section 9592–35 calling for a liberal interpretation of the Act, and the provisions of Section 9592–33 dealing with the procedure by which the license of an insurer may be suspended indicate regulation of the insurance business rather than prohibition against engaging in such business. In our opinion, a consideration of the several provisions of the Code results in the conclusion that it was the purpose of the Legislature to regulate the insurance business by the imposition of a penalty rather than by declaring illegal and void such contracts of insurance as might be issued while the insurer was not in compliance with the provisions of the statute. This conclusion is in accord with the rulings of the Ohio Supreme Court in Warren People's Market v. Corbett & Sons, supra. (Additional cases cited.)

"Nor do we consider the contract as void as against public policy. A contract is not void as against public policy unless it is injurious to the public or contravenes some established interest of society. Gugle v. Loeser, 143 Ohio St. 362, 367, 55 N.E.2d 580. The insurance contract involved in this case, under which appellant has had the benefit of full performance by the appellee, is clearly not of that nature. Warren People's Market Co. v. Corbett & Sons, supra." (Additional cases cited.)

There is neither expressed nor implied language in the Tennessee act to indicate a legislative intent to make insurance policies invalid and unenforceable because of failure of the insurance company to file or have approved en-

dorsements fixing the premium rates. If the Legislature had intended to make the contracts illegal for such failure it could, as stated by Judge Miller in the McCullough case, have easily said so. The Court concludes that plaintiff's failure to have premium rates, as provided for in the endorsements, approved by the Insurance Commissioner did not render the endorsements invalid. This conclusion has been reached after a careful consideration of the authorities relied upon by the defendants in their briefs. The defendants contend that the principles announced in the McCullough case are not controlling in these cases because, as they say, the Ohio law, the Ohio Insurance Act and the decisions of the appellate courts of Ohio interpreting the same are different from the Tennessee Insurance Act and the appellate decisions of Tennessee interpreting similar Acts. With this contention, this Court is unable to agree.

What has been said disposes of defendant's contention that the endorsements are invalid under the Act because they provide for unfair and excessive rates. There is no competent evidence in the record that the endorsements, as construed by the plaintiff, provide for unfair and excessive rates. There is evidence by Currey Sanders, Deputy Insurance Commissioner of Tennessee, that if the endorsements as properly construed, provide for automobile casualty insurance of $3.20 for every $1.00 paid out by the insurance company, such rate would be unfair and excessive. Virginia Surety does not insist that the endorsements entitle it to a premium of $3.20 for each $1.00 paid out. The fact that the experience of the insureds during the first two coverage periods of the policies required the payment by the insureds, according to the interpretation of plaintiff, of $3.20 for each $1.00 paid out, with possibly one exception, does not prove the contention of the defendants that the endorsement provided for the payment of $3.20 premium for every $1.00 paid out by the insurance company. An examination of the endorsements shows the contrary.

If it should be determined that the Court is wrong in the interpretation of Chap. 142 of the 1945 Act, the defendants and cross-plaintiffs nevertheless would not be entitled to recover under the cross-complaint the premiums paid under the policies because of their alleged unenforceability under the Act. This is for the reasons that the contracts were executed, cross-defendants carried the risk and paid all of the losses, and cross-plaintiffs received value for the monies paid under the policies. In this situation it would be inequitable, or in the nature of unjust enrichment to require the return of the premiums. Palmer Bros. v. Havens, 29 Tenn.App. 8, 193 S.W.2d 91.

Having determined that the endorsements are not invalid for failure of the insurer to comply with the aforesaid Act, the Court now faces the problem of the construction of the endorsements.

To be considered in relation to that problem is whether the July 1, 1946 premium endorsements provide for the payment of a composite premium made up of (a) an amount for bodily injury under the standard or primary coverage of $5,000/$10,000, (b) an amount for property damage coverage of $5,000.00, and (c) an amount for bodily injury excess coverage, or whether the premiums accruing at the end of each six-month period shall be calculated so as to produce a result whereby the losses incurred during such six-month period shall equal 60% of the adjusted earned premium, subject to the minimum premium of 1¢ per lineal mile and the maximum premium of 3¢ per lineal mile.

The endorsements on the July 1, 1946 policies are identical and provide as follows:

"It is hereby understood and agreed that this policy is written at a provisional rate of Two Cents ($.02) for each lineal mile operated. At the end of each six month period thereafter a statement shall be made

up by the Company showing the premium earned at the provisional rate and losses incurred for such six month period, and readjustment of the provisional rate shall be made whereby the losses incurred during such six month period shall equal 60% of the adjusted earned premium and if the ratio of losses incurred for any six month period is greater than 60% of the premium earned computed at the provisional rate, then the assured shall pay to the Company as an additional earned premium a sufficient sum of money to establish a 60% ratio and if the ratio of losses incurred for any such period is less than 60% of the premium earned computed at the provisional rate then the Company shall return to the assured as an overpayment of earned premium a sufficient sum of money to establish the ratio of such losses incurred at 60% of the adjusted earned premium.

"The term *'losses incurred'* as used herein shall be understood to mean, and shall mean, the sum of losses and loss expenses actually paid by the Company in cash during the period being accounted for, plus the Company's reserves for losses and loss expenses in connection with losses or claims outstanding at the end of the period being accounted for, less the Company's reserves charged in the accounting for the prior period for losses and loss expenses in connection with losses or claims outstanding at the end of the previous period.

"An accounting shall be rendered by the Company within thirty (30) days after the close of each six month period, or as soon thereafter as is possible, at which time it shall return to the Assured any premium due, or the Assured shall pay to the Company any premium due it.

"There shall be no reduction in rate below One Cent ($.01) for each lineal mile operated applying to this policy and there shall be no increase in rate in excess of Three Cents ($.03) for each lineal mile operated applying to this policy during any six month period, and the limitation contained in this paragraph of a maximum of Three Cents ($.03) for each lineal mile operated, and a minimum of One Cent ($.01) for each lineal mile operated shall be the limits within which any adjustment hereinbefore provided for may be made.

"It is further understood and agreed that the rate quoted herein, including both the maximum and minimum limits thereof, shall include both the excess limits agreed upon as well as the standard limits of $5,000/$10,000 for Bodily Injury Liability and $5,000 for Property Damage Liability, and that such rates shall be broken down in accordance with the casualty rate manual; that the excess limits carried from time to time shall be at the option of the assured; that that portion of the losses incurred under the standard limits and that portion of the rate applicable to the standard limits shall be the amounts upon which such retrospective rating shall be based, and excess amounts of both premium and losses shall not be considered in such computation."

This endorsement is known in the insurance world as the retrospective premium endorsement. It was prepared by the insurance company. Virginia Surety first became the insurer of defendants in July, 1944. At that time the insured paid so much per unit or vehicle. The premium began at $715 per unit. It was increased in October to $900 per unit, and increased again on June 1, 1945 to $1100 per unit on the TCC operations. Increases were also made on the KTL units. Al Kraemer became dissatisfied with the amount of premiums that he was paying and caused a survey to be made of premiums being paid by other bus operators in similar situations and found that his companies were paying a much higher average rate per gross in-

come and per lineal mile than were the other bus operators. He complained to Hankison (now deceased), president of plaintiff, and Asquith, local representative for plaintiff, and other representatives for plaintiff. The rate increased as high as $2,000 on some of the units. These rates disturbed Kraemer so much that he threatened to cancel the policies and procure insurance in another company, or become self-insured. He notified the representative to this effect. A conference was arranged between the representatives of the plaintiff and the defendants to be held in Knoxville on May 13, 1946, the main purpose of which was to work out a plan whereby defendants' premium rates would be reduced and plaintiff would continue as defendants' insurance carrier. The primary purpose of the meeting, insofar as defendants were concerned, was to reduce the insurance rates. The primary purpose of the plaintiff was to save the business by working out a rate satisfactory to the defendants and at the same time produce rates commensurate with the risk. One of the strange things about this meeting is that the parties who participated do not agree at what place in Knoxville it was held. Hankison, Lasher and Mike Kraemer, participants in the meeting, are deceased. The living participants, representing the plaintiff, all testify that the meeting was held in the office of Al Kraemer which is a part of the offices of TCC. The living participants, representing the defendants, say that the meeting was held in the Farragut Hotel. The fact that the witnesses testified approximately nine years after the meeting was held and that the memory of witnesses fails with respect to such things, may be a plausible explanation for the many irreconcilable conflicts in the statements of the witnesses with respect to the place of the meeting and what was said and done by the various participants.

The witnesses for the plaintiff say that the matters that were later incorporated in the endorsements were discussed in a general way by Hankison. The witnesses for the defendants necessarily say that the matters were not discussed for the reason that the meeting was not held. Kraemer, Pryor and Anderson say the meeting was held in the Farragut Hotel and that soon after the participants assembled Hankison stated in substance that he wanted to talk with Al Kraemer and that Hankison and Al Kraemer proceeded to another room in the Farragut Hotel. Al Kraemer says that he and Hankison proceeded from the meeting to Hankison's room where they discussed the involved insurance problems for about an hour; that he told Hankison that he wanted insurance for his companies that would not exceed 1.2 cents per lineal mile for TCC and 1.4 cents per lineal mile for KTL; that Hankison replied, "don't worry about that, this proposition will guarantee you that. I will guarantee you that your cost will never exceed 2¢ per lineal mile." Kraemer then said, "let's put it in writing," and Hankison replied, "I will go back to the office and write you a proposition;" that Hankison stated that the insurance would never be more than 60% of the adjusted earned premium; that he explained the 60% figure by saying that if the companies had a loss of $60 that the cost to them would amount to $100; that Hankison explained that he did not want the others to know about the deal he was making; that he received a letter from Hankison dated June 1, 1946 in which the endorsements were enclosed; that he read the endorsements enclosed in the June 1st letter which was identical with the endorsements on the policies in suit and concluded that the wording was in accordance with the agreement made with Hankison; that he read the endorsements to the auditors in his own organization and explained his agreement with Hankison in the Farragut Hotel and that they all came to the conclusion that the endorsement was in agreement with the endorsement made in the hotel; that no mention of standard and excess coverage was made in the conversation at the hotel; that no mention was made of a rate of 92% on the excess limits; that no mention was made of the manual re-

ferred to in the endorsement; that he first learned that plaintiff was claiming an additional premium at the rate of 92% under the excess limits in the May, 1947 meeting also held in Knoxville; that he blew up at that time and stated that he was cancelling the policies. Soon after the meeting he ascertained that the policies provided for a 30-day notice of cancellation in writing. Thereafter, a 30-day notice of cancellation was given by TCC and KTL. In the meantime, Hankison communicated with Al Kraemer by telephone and letter. One or more other parties contacted Kraemer concerning the matter. After some negotiation an emergency retrospective premium endorsement was agreed upon between plaintiff and the two defendants whereby the companies agreed that the readjustment of the provisional rates should be made to produce rates whereby the losses incurred during the 6-month period should equal 70% of the adjusted earned premium with respect to the primary limits of $5,000/$10,000 bodily injury and $5,000 property damage. With respect to the excess limits of $20,000/-$190,000 bodily injury and $5,000 property damage, the adjusted premium for each 6-month period was to be computed on 70% of the percentages of increase as shown by the standard manual of the National Bureau of Casualty and Surety Underwriters of the bodily injury and property damage premiums for primary limits as adjusted on the primary limits of $5,000/$10,000 bodily injury and $5,-000 property damage, or 64.4% of the adjusted premium for the standard or primary coverage. This endorsement also provided for the provisional rate of 2¢ for each lineal mile operated with the agreement that the adjusted rates, both under primary coverage and excess coverage for any 6-month period, should not be less than 50% or more than 150% of the provisional rate of 2¢ per lineal mile broken down as follows:

(From Exhibit No. 4)

| | |
|---|---:|
| Provisional Rate with respect to primary limits of $5,000/$10,000. Bodily injury | $ .010115 |
| Provisional Rate with respect to primary limit of $5,000. Property Damage | .003372 |
| Provisional Rate with respect to Bodily Injury limits of $20,000/$190,000 in excess of the primary limits of $5,000/$10,000 | .006513 |
| Provisional Rate with respect to Property Damage limit of $ 0 in excess of the primary limit of $5,000 | 0 |
| | $ .020000 |

The foregoing endorsement became effective July 1, 1947 and continued until September 8, 1947 when the policies were cancelled. There is no dispute as to its meaning and as to the method of computation of the premium rates thereunder. None of the earned premiums under this endorsement have been paid.

The parties operated without dispute for the first six months under the endorsements of July 1, 1946. Asquith wrote letters to the defendants during this period complimenting them on decreasing their losses but in January, 1947 he indicated to Al Kraemer and another representative of the defendants that the defendants would be called upon for more premium. This information caused consternation to Al Kraemer and he ordered the discontinuance of the payment of the 2¢ per lineal mile provisional premium. One of his explanations for doing so was when he received word from Asquith that he would be called upon for additional premium he felt that there was to be another "drag out," referring to the increase rates made by the plaintiff under the policies that insured on a per vehicle basis. When the payment of provisional rates was discontin-

ued Hankison tried to arrange a conference with Al Kraemer. Kraemer and Asquith were engaged in interstate commerce hearings in Nashville, and possibly elsewhere, and for this reason, and other reasons, the conference was not held until May 13, 1947. It was in that conference that the first accounting was presented by the plaintiff covering the losses and the adjusted premiums. This accounting covered the period from July 1, 1946 through March, 1947, or a 9-month period. Hankison explained that additional premiums were due and the method of calculating the premiums. This was the first time that Al Kraemer and the other representatives of the defendants learned that the endorsements provided that the rates were to be computed on the excess coverage of the policies at the rate of 192% of the adjusted premiums on the primary or standard coverage in the policies. This was the first time that Al Kraemer learned that this method of calculation was made under the standard rating manual of the National Bureau of Casualty and Surety Underwriters.

A policy was written by the plaintiff covering TCC operations at the Clinton Engineering Works and became effective at the same time that the two policies in question became effective, namely, July 1, 1946. This policy was only in force from July 1, 1946 to October 1, 1946 as the Government changed its operation at the Clinton Engineering Works in Oak Ridge and thereby terminated its contract with TCC. The CEW endorsement was identical with the two endorsements under consideration except that the endorsement covering the CEW provided for the 198% rate for the excess coverage.

On November 26, 1946, Hankison wrote Al Kraemer a letter enclosing a statement showing the computation of the premium adjustment under the TCC endorsement covering the Clinton Engineering Works operation, advising him that TCC was entitled to a return premium on the policy of $3,016.26. The enclosed statement shows the break-downs for the primary or standard bodily injury coverage of $5,000/$10,000 and $5,000 for property damage loss, and the excess coverage of $45,000/$190,000 for bodily injury losses. The statement shows that the only loss was a property loss of $334.75. Al Kraemer stated that he received the letter and endorsements but that he attached no significance to that part of the statement that refers to excess coverage. He stated that he thought that the statement provided for the computation of adjusted premiums in accordance with Hankison's agreement made with him in the Farragut Hotel room on the evening of May 13, 1946.

Having considered the main circumstances surrounding the execution of the endorsements that became effective July 1, 1946 and the circumstances under which they were cancelled as of July 1, 1947 by the substitution of new endorsements that became effective on the latter date, we now consider paragraph by paragraph the endorsements that became effective July 1, 1946.

The two original endorsements as previously indicated, are identical in terms.

The first paragraph of each endorsement provides for a 2¢ provisional rate for each lineal mile operated. An accounting is required by plaintiff in the form of a statement showing the premium earned at the provisional rate and the losses incurred for each 6-month period and readjustment of the provisional rate is to be made whereby the losses incurred during such 6-month period shall equal 60% of the adjusted earned premium and if the ratio of losses incurred for any 6-month period is greater than 60% of the premium earned computed at the provisional rate, the insured shall pay to the insurer as an additional earned premium, a sufficient sum to establish a 60% ratio and if the losses incurred for such period is less than 60% of the premium earned the company shall return to the insured a sufficient sum to establish the ratio of such losses incurred at 60% of the adjusted earned premium.

The second paragraph defines losses incurred as including losses and expenses paid plus reserves for losses and expens-

es in connection with outstanding claims at the end of the 6-month period accounted for, less the company's reserves charged in the accounting for the prior period for losses and loss expenses in connection with losses or claims outstanding at the end of the previous period.

It is stipulated that all of the losses have been paid and that reserve factors are not a part of the adjusted premiums now claimed.

The third paragraph provides for an accounting at the end of each 6-month period which is covered in the first paragraph.

The fourth paragraph provides for the minimum and maximum provisional rates of 1¢ and 3¢ per lineal mile and states that these are the limits within which any adjustment in paragraphs 1, 2 and 3 provided for, may be made.

The provisions of the fifth paragraph of the endorsement are the provisions over which the controversy arises. This paragraph states that the rate shall include "both the maximum and minimum limits thereof, * * * both the excess limits agreed upon as well as the standard limits of $5,000/$10,000 for bodily injury liability and $5,000 property damage liability, and that such rate shall be broken down in accordance with the casualty rate manual; * * * that the excess limits carried from time to time shall be at the option of the insured; that that portion of the losses incurred under the standard limits and that portion of the rate applicable to the standard limits shall be amounts upon which such retrospective rating shall be based, and excess amounts of both premium and losses shall not be considered in such computation."

Plaintiff filed a booklet entitled, "Manual of Automobile Insurance, Rules and Rates." On the first page of this booklet there is written in typewriting the following: "Rules and rates in effect July 1, 1946." This booklet consists of many pages. The fifth page of this booklet indicates that these rules and rates were prepared by the National Bureau of Cas-

ualty and Surety Underwriters, 60 John Street, New York 7, N. Y.

Although some of the witnesses for plaintiff stated that Hankison referred to the rate manual in the conference of May 13, 1946, none of them said that he mentioned a standard rate manual of the National Bureau of Casualty and Surety Underwriters. All of the witnesses for the defendants testify that they never heard of any kind of a rate manual until the one was filed as Exhibit 5 during the trial. Hankison may have mentioned a rate manual in this meeting but the evidence shows that neither he nor any other person mentioned the National Bureau of Casualty and Surety Underwriters rating manual in that meeting or at any other time to Al Kraemer, or any other representative of the defendant.

Plaintiff computed the adjusted premium on a loss ratio basis of 192% of the standard limits of bodily injury and property damage. The computation was made in accordance with the tables pertaining to busses set forth on page 14 of the manual filed as an exhibit in the record. It is not possible to compute the adjusted premium for the excess coverage from the language contained in paragraph 5, or any other paragraph of the endorsements that became effective on July 1, 1946. This manual is not made a part of the endorsements by reference or otherwise, hence, there was nothing to put the insureds on notice that the adjusted rates would be computed on a 192% ratio of the standard coverage losses.

Section 6086 of the Tennessee Code provides that every insurance policy issued in Tennessee shall contain the entire contract of insurance. This statute was enacted for the benefit of Tennessee policy holders. Insurance Co. v. Craig, 106 Tenn. 621, 62 S.W. 155; Humpston v. State Mutual Life Assurance Co., 148 Tenn. 439, 256 S.W. 438, 31 A.L.R. 78.

■ The manual of the National Bureau of Casualty and Surety Underwriters cannot be referred to in computing

the rates on the endorsements because neither it nor its provisions are set forth in the endorsement.

As pointed out at page 63 in defendants' brief, before a manual can be looked to in determining the rights and liabilities of the parties it must have first been referred to in the body of the policies by plain and clear language and properly made a part thereof.

In Couch—Cyclopedia of Insurance Law, Vol. 1, page 316, sec. 161, the rule is stated to be:

"*  *  *  As a general rule, however, to become a part of the policy, a manual or instruction book must be embodied therein by the use of plain, unmistakable terms, or, at least, by reference thereto as governing the rights of the parties * * *"

To the same effect is the case of Miller v. Missouri State Life Ins. Co., 168 Mo. App. 330, 153 S.W. 1080, where the court said:

"*  *  *  The manual giving these definitions was not a part of the policy, nor was it mentioned or referred to therein; yet, if its provisions were to have the effect desired by defendant, they would have become one of the principal parts of the contract. To have had this effect, they should have been embodied in the face of the contract, or referred to therein and made a part thereof in plain, unmistakable terms. McDonald v. Bankers' Life Ass'n of Des Moines, Iowa, 154 Mo. loc. cit. 628, 629, 55 S.W. 999; Elliott v. Safety Fund Life Ins. Co., 76 Mo.App. 562; 1 Joyce on Insurance, § 191." 153 S.W. at page 1082.

It results that paragraph 5 of the endorsement is unenforceable for the reason that the manual relied upon by the plaintiff for the computation of the adjusted premiums is not made a part of the endorsement and for the further reason that without its having been made a part thereof the fifth paragraph is too vague, uncertain and ambiguous to form an enforceable contract.

Other questions are made by the parties to the suit, the disposition of which is not necessary to the findings and conclusions herein set forth.

With the fifth paragraph rejected as too indefinite to incorporate any rating table by reference, plaintiff's claim for extra premiums based thereon must likewise be rejected, except for the period from July 1, 1947, to September 8, 1947, which period does not have the infirmity of indefiniteness. Yet how does this rejection affect the remaining paragraphs of each endorsement?

To begin with, neither the insurer nor the insured contends that the other four paragraphs were intended to comprise the entire contract. If such contention were made, the evidence would preponderate against it. Excess coverage as an insurance device was within the experience of all of the parties. So, too, was its practical operation, in particular its variability of cost in relation to the amount of coverage per person and per accident. It is inescapable that the provision for excess coverage was an integral part of the total scheme for determining the periodic premiums. Without that provision premium determination, though greatly simplified, was erratic and illusory.

This can be illustrated by a determination of KTL premiums for the first two insurance periods, with reliance solely upon the four paragraphs that remain after the fifth has been rejected. These paragraphs lend themselves readily to a breakdown of four parts, or steps, for premium computation, namely, (1) computation of the provisional premium, (2) computation of the adjusted premium, (3) determination of the ratio for computation of the final earned premium, and (4) computation of the final earned premium itself. For convenience, quotations will be made in connection with these steps.

From the first paragraph of the endorsement: "It is hereby understood and agreed that this policy is written at a

provisional rate of Two Cents ($.02) for each lineal mile operated. At the end of each six month period thereafter a statement shall be made up by the Company showing the premium earned at the provisional rate and the losses incurred for such six month period, and readjustment of the provisional rate shall be made whereby the losses incurred during such six month period shall equal 60% of the adjusted earned premium * * * "

This provision has the following results when applied to the period of July 1, 1946, through December 31, 1946:

Lineal miles operated: 2,415,367
Provisional premium
(@ 2¢ per mile): $48,307.34

Finding the provisional premium constitutes the first step. The second step is finding the adjusted premium. By quoted provision above, the losses incurred during the period shall bear with respect to the adjusted premium a ratio of 60%. The adjusted premium is found by multiplying the losses incurred by 100 and dividing the product by 60.

Losses incurred for the period: $33,679.59
Adjusted premium
($33,679.59 x $\frac{100}{60}$): $56,132.65

The third step is contained in the next quotation from the endorsement, which is a continuation of the provision above quoted:

" * * * and if the ratio of losses incurred for any six month period is greater than 60% of the premium earned computed at the provisional rate, then the assured shall pay to the company as an additional earned premium a sufficient sum of money to establish a 60% ratio * * * "

This quotation tells how to find the ratio between losses and the provisional premium, that is, what percent $33,679.59 is of $48,307.34.

Ratio of loss
($33,679.59 ÷ $48,307.34): 69.72%

As the loss is greater than 60% of the provisional premium, under the last quoted provision of the endorsement the insured should pay additional premium, with the result that the original payment of provisional premium should be increased so that the loss will be exactly 60% of the total premium.

As shown above, the loss incurred is 60% of the adjusted premium. As the provisional premium must be increased until the loss incurred is 60% of this provisional premium, the new provisional premium will be the same as the adjusted premium. This will always be the result where the loss incurred is more than 60% of the provisional premium.

Accordingly, the last quoted provision would have had the same meaning had it read: "Where the loss incurred is more than 60% of the provisional premium, the insured will pay the adjusted premium."

As heretofore shown, the adjusted premium is $56,132.65. The difference between the adjusted premium and the provisional premium is found as follows:

$56,132.65–$48,307.34: $7,825.31

To comply with the provision in the last quotation, the insured would be required to pay an additional premium of $7,825.31. Losses incurred would then bear the ratio of 60% in relation to the final earned premium.

Without repeating the whole statement of procedure, the period of January 1, 1947, through June 30, 1947, results in the following:

Lineal miles operated: 2,415,868
Provisional premium
(@ 2¢ per mile): $48,317.36
Losses incurred: $23,822.13
Adjusted premium: $39,703.55

For this period, the ratio between the losses incurred and the provisional premium is 49.3%. As this is less than 60%, the insurer owes the insured a refund, in accordance with the next, or alternate, provision of the endorsement:

" * * * and if the ratio of losses incurred for any such period is less than 60% of the premium earned computed at the *provisional rate* then the Company shall return to the assured as an over payment of earned premium a sufficient sum of money to establish the ratio of such losses incurred at 60% of the *adjusted earned premium.*" (Italics added.)

Sixty per cent (60%) of the adjusted premium is $23,822.13. The over payment is the difference between this sum and the provisional premium:

$48,317.36–$23,822.13:          $24,495.23

However, the endorsement in its fourth paragraph provides that the premium shall not be less than a premium computed at 1¢ per mile. At the minimum rate the premium would be $24,158.68, which is greater than the premium of $23,822.13, arrived at by the prescribed method.

By reference back to figures stated at the beginning of computations for this second period, it will be seen that the losses incurred are $23,822.13. Except as changed by the minimum provision just mentioned, where the losses incurred are less than 60% of the provisional premium, the final earned premium and the losses incurred will be the same. This alternate method of premium computation could, therefore, be stated as follows: "Where the loss incurred is less than 60% of the provisional premium, the insured will pay as premium a sum exactly equal to the loss." This will always be the result, by reason of the formula prescribed.

A surprising result is reached. If the adjustment ratio should be slightly over 60%, the insured would be required to pay a sum equal to the adjusted premium, and an additional premium would always be due. If the adjustment ratio should be 59.99%, the insured would be required to pay only a sum equal to the losses incurred, and a refund would always be due.

■ This result was not within the contemplation of the parties, and the endorsement, construed without the fifth paragraph, is untenable for the reason that it does not represent a meeting of the minds of the parties, as well as for the reason that it cannot be applied with any degree of certainty. The fifth paragraph must be rejected because it does not sufficiently incorporate excess coverage rates by reference. Yet without it the endorsement is deficient, and the premium payable is reduced to a guess. Likewise, any attempt to adjust accounts between the parties would be the product of guesswork, which is outside the Court's functions.

■ For the period of July 1, 1947, to September 8, 1947, a greatly revised and much more specific endorsement was provided in each case. For this period plaintiff has carried the burden of proof as to its claim that defendant Knoxville Transit Lines owes it as unpaid premium the sum of $10,678.27, and that defendant Tennessee Coach Company owes it the sum of $22,087.20. For those two sums, plaintiff is entitled to judgment.

Let appropriate orders be presented.

Interest will not be allowed on the recoveries. Costs will be divided equally in each case between the plaintiff and the defendant.