UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff and Counter-defendant-Appellee, *v.* HOLLERICH AND WALGENBACH Co., Defendant and Counterplaintiff-Appellant.

HOLLERICH AND WALGENBACH Co., Plaintiff-Appellant, *v.* WALTER DUNCAN *et al.*, Defendants-Appellees.

(No. 73-72;

Third District—September 18, 1974.

Kevin Kelly, of La Salle, and Louis E. Olivero, of Peru, for appellant.

John Berry, of Ottawa, and Anthony C. Raccuglia, of Peru, for appellees.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from various orders of the Circuit Court of La Salle County entered in a jury trial of consolidated causes of action wherein the principal parties were United States Fidelity and Guaranty Company (Fidelity), Hollerich and Walgenbach Co. (H & W), a contractor engaged in asphalt road construction, and the Duncan Insurance Agency (Duncan), an agent of Fidelity.

Basic facts gathered from a voluminous record disclose that in August 1963 an officer of H & W contacted Duncan relative to the acquisition of insurance coverage and indemnity bonds necessary for a heavy road construction company. Thereafter, H & W purchased various types of insurance, including fire, floater, general liability and workmen's compensation policies, and from time to time obtained indemnity bonds guaranteeing its performance of contracts with municipalities, counties and the State of Illinois. All of such bonds and policies were obtained from Fidelity with Duncan acting as agent.

Some of the policies had a fixed annual premium. The workmen's compensation and general liability policies, however, required periodic audits of the number of employees, their wages and other factors, such as type of work, in order to determine the amount of annual premium due in excess of deposits made at the beginning of the policy terms. In connection therewith, each of the policies in question provided for an interim audit and the adjustment and payment of premiums at the end of the first 6 months of the policy term, and for a final audit, adjustment and payment of premiums at the close of the policy year. Bills for premiums were sent to Duncan as they became due or were determined, and, under the arrangement between Duncan and Fidelity, Duncan would pay Fidelity for all charges and premiums billed, whether or not they had as yet been collected from the insured. If it later turned out that Duncan was unable to make collection, the bill would be returned

to Fidelity, which would reimburse Duncan and then attempt direct collection from the insured.

On December 29, 1965, H & W owed Duncan a balance of $4,510.84 in a running account maintained in Duncan's books. When such balance remained unpaid on February 3, 1966, Duncan, following up a telephone conversation, wrote H & W that if payment was not made by February 8, its only alternative would be to cause cancellation notices to be sent out on all policies. It would be noted that the policies involved gave the insurer the right to cancel on 10 days' notice without stating a reason. Payment was not made within the time limit set and cancellation notices were sent out on all policies. On February 11, 1966, however, the $4,510.84 was paid and the policies were reinstated. At this time, H & W's account with Duncan showed a credit balance of $38, the credit arising from a change in insured automobiles. Also about this time, according to witnesses for H & W, the latter started to complain to Duncan that errors and discrepancies in the computation of prior premiums had resulted in overcharges to H & W.

On March 21, 1966, Duncan received the interim audit on the policies for the period from August 26, 1965, to February 26, 1966, which showed an additional premium of $6,113.47 due for such period. Duncan paid this amount to Fidelity, debited the H & W account therefor, and, on April 5, 1966, billed H & W for $6,075.47, being the amount due as shown by the interim audit, less the $38 credit. According to its president, H & W had by this time made a determination that prior discrepancies and miscalculations had resulted in premium overcharges in excess of $12,000, and he advised Duncan that the April 5 bill would not be paid until the matters questioned had been resolved and adjusted. Duncan, the witness further testified, promised to look into the complaints and to discuss them with Fidelity, but did not again contact H & W with respect thereto. On April 26, 1966, Duncan sent notice to H & W that if the account was not paid by April 30, 1966, cancellation notices would be sent out on all policies. Payment was not received and on May 9, 1966, at Duncan's request, Fidelity cancelled all policies.

In the meantime, on April 29, 1966, the final audit for the period from August 26, 1964, to August 26, 1965, was completed and showed additional premiums of $12,063.96 due for that period. This audit was also sent to Duncan, and was apparently received prior to the date of cancellation. Duncan, however, did not pay such amount to Fidelity, or charge it to the H & W account, or bill it to H & W or try to collect it, in the belief that an attempt to collect would be futile in light of the lack of success in collecting the $6,075.47 already billed. On May 9, 1966, Duncan returned both audit bills to Fidelity for direct collection from H & W, and

entered a credit of $6,113.47 in its book account with H & W, since Fidelity was to undertake collection of premiums due on its policies. As was true in the earlier instance referred to, this left H & W with a credit of $38 so far shown on Duncan's books.

The present litigation was initiated on May 31, 1972, when Fidelity brought suit against H & W to recover $18,177.43, the total amount due under the two audits. (In the record, Fidelity conceded that, as a result of credits for unearned premiums and adjustments produced by a final audit, the *ad damnum* could be reduced to $13,178.67.) H & W filed a counterclaim, one count charging Fidelity with breach of contract and other counts charging slander and libel. In addition, H & W filed a separate action against Duncan for breach of contract. The actions were consolidated and at the conclusion of all of H & W's evidence (offered with respect to its defense in the principal action, in support of its counterclaim, and in the separate action against Duncan) various motions for directed verdicts were filed and considered by the court. As a result, verdicts were directed for Fidelity on H & W's counterclaim, and for Duncan in H & W's separate action for breach of contract. In the principal action, the court denied Fidelity's motion for a directed verdict in the amount of $8,389.32, stating that there were factual questions as to the amount owed, but allowed an alternative motion directing a verdict on the issue of liability and instructed the jury that the sole issue for its determination was the amount Fidelity was entitled to recover from H & W. Thereafter, the jury returned a verdict of $7,500 in favor of Fidelity, and, when post-trial relief was denied, H & W (hereinafter referred to as appellant) perfected this appeal. For the most part, the issues center on the rulings made on the motions for directed verdicts.

From appellant's brief, which apparently fails to recognize that Fidelity had an unfettered right to cancel the policies in question at any time, we interpret appellant's first contention to be that the trial court erred in the principal case when it directed a verdict for Fidelity on the issue of liability. Broadly speaking, it is appellant's theory that the evidence, viewed in its aspects most favorable to appellant (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494), shows that it owed Fidelity no premiums, by reason of which it is contended that it was wrong to direct a verdict on the issue of liability and to submit the amount of damages to the jury. To arrive at the conclusion that the evidence shows no premiums were due to Fidelity, appellant rationalizes, in sequence, that Duncan was the agent of Fidelity for the purpose of collecting premiums on all policies; that the books of Duncan were therefore conclusive and controlling as to the amount of premiums due and owing by appellant from time to time; and that the books of Duncan showed

nothing due and owing on May 9, 1966, the date the policies were cancelled and the insured-insurer relationship was terminated, inasmuch as Duncan's books showed a credit on that date for the $6,113.47 due and billed as the result of the interim audit, and since the $12,063.96 shown to be due by the final audit had neither been charged to appellant on Duncan's books nor billed to appellant.

■■ When all of the evidence in the record is considered, particularly that which explains the basis for Duncan's system of accounting for Fidelity's premiums and shows the circumstances surrounding the entries upon which appellant's theory is based, it is our opinion that this contention is clearly unsound. The insurance contracts were between appellant and Fidelity, not appellant and Duncan. It is not denied that Fidelity extended coverage for the periods for which additional premiums were due, and there is no pretense that the premiums shown to be due by the audits were ever paid by appellant to anyone. Neither have we been given, nor have we found, satisfactory authority for the premise that, so far as the liability of an insured to an insurer for premiums is concerned, an insurer is conclusively bound by the books and method of accounting of an agent. *National Hotel Co. v. Merchants' Fire Assurance Corp.*, 183 Ill.App. 71; *Pulaski Mutual Fire Ins. Co. v. Dawson*, 87 Ill. App. 514; and *Ellenbogen v. Frankfort General Insurance Co.*, 202 Ill. App. 125, upon which appellant principally relies, are not applicable and present no persuasive analogy. The rationale of those cases is that where an insurance company delivers its policy to an insured through a broker as agent, to whom the insured pays the premiums, the company is liable on the policy, even though the broker or agent fails to remit the premiums, since the broker or agent had been clothed with apparent authority to collect. In the present case it may be agreed that Duncan was clothed with the authority to collect premiums from appellant, but there, we believe, all similarity with the cases relied upon comes to an end. The apparent authority to collect premiums would not extend to authority in a broker or agent to waive the insured's obligation to pay premiums, nor would appellant, or any reasonable person, be led to believe that such was the case. In our opinion the trial court correctly rejected appellant's theory of "nothing due" as a basis for denying Fidelity's motion for a directed verdict on the issue of liability.

■■ Equally untenable is the contention that the circumstance that evidence showed that appellant had protested, and was contesting, the amount of premiums due, made it improper for the court to direct a verdict on the issue of liability. The mere statement of this contention furnishes the ground for its rejection. Quite obviously, the evidence showing a dispute as to the extent of liability had no bearing on a

determination of whether the evidence justified a directed verdict that liability did or did not exist. Just as obviously, since various factors and elements relating to the amount of damages were put in dispute by the evidence, the trial court properly submitted the issue of the amount of damages to the jury.

■■ It will be recalled that the jury was instructed that the sole issue for its determination "is the amount" that Fidelity "is entitled to recover" from appellant. Appellant necessarily argues from a position that the evidence should have been construed as showing nothing due, and argues, first, that the instruction was tantamount to telling the jury that it had to return a verdict for Fidelity in some amount, and, second, that the instruction deprived appellant of the benefit of the evidence by which it disputed the amount due. We do not find that these objections to the instruction were made in the trial court and preserved for review. In any event, however, they are unconvincing. While the use of the words "if any" would have improved the instruction, we do not see in it a mandate to the jury that it had to find that some amount was due Fidelity. Most certainly, it did not deprive appellant of its evidence of its defense as now claimed. The recovery sought by Fidelity on the basis of its evidence was $13,178.67, but the jury returned a verdict of only $7,500. Necessarily, the jury took the evidence of appellant into consideration, a circumstance borne out by the showing in the record that the largest items in dispute approximated $5,000. No contention has been made, we might add, that the verdict on damages was against the manifest weight of the evidence.

■■ When Fidelity made its proof of damages, the trial court, over the objection of appellant, permitted proof of the premium rate for certain hazards, "sewer work" in particular, to be established from a company manual. It is now contended that proof of the premium rate in such manner constituted reversible error. The thrust of appellant's argument is that the rates were controlled by the policy, or insurance contract, and that the manual was not part of the policy. As a general rule a company manual is not a part of an insurance policy. It may, however, become so, provided it is embodied in the policy or an endorsement by clear and unmistakeable terms, or by a reference thereto as governing the rights of the parties. (See 1 Couch, Cyclopedia of Insurance Law § 161, at 316; *Tropical Roofing Co. v. Charnow* (Fla. 1961), 134 So. 2d 32; *Virginia Surety Co. v. Knoxville Transit Lines, Inc.* (E.D. Tenn. 1955), 135 F.Supp. 606.) Here, we find that the policies involved provided: "The premium bases and rates for the hazards disclosed in the declarations are stated therein. Premium bases and rates for hazards not so described are those applicable in accordance with the manuals in

use by the Company." We find that proof of rates from the manual was permitted only with respect to hazards not described in the policy. Under the law, and under policy language so clear, the trial court committed no error in permitting such proof to be made.

In its reply brief appellant advances the additional contention that it was error to admit proof of the rate for "sewer work," for the reason that the evidence shows that appellant did not engage in such work during the policy period covered by the audits. While we are constrained to remark that the verdict indicates this argument was not lost to the jury, the contention comes too late to permit its consideration. It is well settled that courts of review will not consider points raised for the first time in a reply brief. *Department of Public Works & Buildings v. Association of Franciscan Fathers*, 3 Ill.App.3d 503; *People v. 123 Punch Boards*, 8 Ill.2d 520.

Generally speaking, and so far as is necessary for this opinion, appellant's counterclaim against Fidelity charging slander and libel entailed communications by Fidelity employees to concerned persons with whom appellant had paving contracts informing them that appellant's insurance had been cancelled for non-payment of premiums. In other instances, where appellant had defaulted on performance bonds, information of the default was given to other contractors approached by Fidelity to complete the work. In directing a verdict for Fidelity on the counterclaim, the trial court ruled, in substance, that the statements and communications relied upon were true and that the truth constituted a defense, and in any even that their publication had been privileged. Appellant now contends that the directed verdict was improper, first, because Fidelity had admitted in a pleading that the statements were libelous and slanderous and, second, on the ground that the evidence showed that appellant owed no premiums, thus causing the statements relating to the non-payment of premiums to be false. We find no merit in either contention.

■■■ It is well established that truth is a defense to an action for libel or slander (*Delis v. Sepsis*, 9 Ill.App.3d 217; *Mitchell v. Peoria Journal-Star, Inc.*, 76 Ill.App.2d 154), and it is equally well established that, for such defense to be availed of, it must be specially pleaded. (*Campbell v. Masonic Chronicler Publishing Co.*, 214 Ill.App. 601.) Speaking of this matter, it is said in 33A I.L.P. *Slander and Libel* § 96 (1970), at page 104: "The factual truth of defamatory matter as justification must be specially pleaded in the answer. A plea of justification is a plea in confession and avoidance; it confesses the publication and justifies by alleging the truth thereof." In the present case, Fidelity, by way of an affirmative defense, pleaded the truth of the statements alleged in the

counterclaim; however, even if we assume, without deciding, that such plea had the effect of admitting that such statements were libelous and slanderous, as appellant contends, the admission did not render a directed verdict impossible or improper. To repeat, truth is a defense, and on the evidence in this record the direction of a verdict for Fidelity on the charges of libel and slander was entirely proper.

In advancing the contention that the directed verdict was improper because the statements as to non-payment of premiums were false, appellant once again resorts to the theory that no premiums were due when the policies were cancelled because of the zero balance on Duncan's books, and because appellant was claiming overcharges in the past. We see little purpose in further pursuing this theory. As was true in regard to the motion for a directed verdict on the issue of liability in the principal suit, the evidence showed that premiums were due from appellant and the same evidence justified a finding by the trial court that the statements regarding non-payment of premiums were true.

At least three of the policies cancelled by Fidelity were fixed premium policies upon which no premiums were then due, and it is urged by appellant that this circumstance made a directed verdict on the counterclaim improper. Again, we cannot agree. All of the policies involved gave Fidelity the right to cancel at anytime without giving a reason, and it appears in the record, without contradiction, that the non-payment of premiums on the workmen's compensation and liability policies was the catalyst which caused all policies to be cancelled. Accordingly, the fact that there was no premium due on some of the policies cancelled does not, in our opinion, detract from the truth of the statements that appellant's insurance coverage was cancelled for non-payment of premiums.

The further contentions of appellant that the cancellation by Fidelity constituted a breach of contract, and that the trial court erred in directing a verdict on the count of the counterclaim which sought to recover damages for such breach, may be readily disposed of. As noted, before, Fidelity had a policy, or contract, providing a right to cancel at any time without giving a reason. In exercising such contract right, Fidelity could not have been guilty of breaching the contract. *C.f., Brown v. Federal Life Insurance Co.*, 353 Ill. 541.

■■ Finally, it is contended by appellant that the trial court improperly directed a verdict for Duncan in appellant's action against the latter for breach of contract. In essence, it is appellant's theory that Duncan had an oral contractual obligation to procure insurance for appellant, and that it violated such obligation when it requested Fidelity to cancel the policies. Even if it be assumed that the evidence was sufficient to estab-

lish a contractual obligation to appellant on the part of Duncan to do anything other than to procure insurance coverage, the obligation was necessarily dependent upon the payment of the required premiums by appellant, and in our opinion a request by Duncan for the cancellation of the policies under the circumstances here could not constitute a breach which would support appellant's action. Addressing itself to a comparable problem and factual situation a Massachusetts court has held in *Rozen v. Cohen* (1966), 350 Mass. 231, 214 N.E.2d 451, that an insurance agent breaches no obligation to an insured when such agent requests a cancellation of policies for non-payment of premiums, and we share that view. (See also *Ruby S. S. Co. v. Johnson & Higgins* (2d Cir. 1927), 18 F.2d 948.) Accordingly, we find that the court did not err in directing a verdict for Duncan.

Since we find no reversible error, the judgment of the Circuit Court of La Salle County is affirmed.

Judgment affirmed.

SCOTT, P. J., and STOUDER, J., concur.